Clarence **WILLIAMS** and Arlene Jackson, Appellants,

v.

**UNITED STATES** of America, Appellee.

Nos. 22870, 22871.

United States Court of Appeals Ninth Circuit.

Oct. 17, 1969.

Rehearing Denied in No. 22871 Dec. 24, 1969.

---

Karl N. Stewart, Phoenix, Ariz. (argued) for Williams; Murray Miller, Phoenix, Ariz. (argued for Jackson), for appellants.

Philip S. Malinsky (argued) Asst. U. S. Atty., Edward E. Davis, U. S. Atty., Phoenix, Ariz., for appellee.

Before BROWNING, CARTER, and HUFSTEDLER, Circuit Judges.

HUFSTEDLER, Circuit Judge:

Williams and Jackson were jointly tried and each was convicted for concealing illegally imported heroin in violation of 21 U.S.C. § 174.[1] Both of them appeal, raising the issues: (1) Did the District Court err in denying their motions to suppress the heroin as the product of an illegal search? (2) Did the District Court err in denying their motions for acquittal based upon the insufficiency of the evidence to sustain the jury's implied finding of possession?

We hold: (1) The search was not illegal because Williams' arrest was not as

a matter of law a pretext for the warrantless search and because the rule of Chimel v. California (1969) 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, does not apply to searches conducted before June 23, 1969, the date of the *Chimel* decision; (2) the evidence was insufficient to support Jackson's conviction; and (3) the evidence was sufficient to support Williams' conviction.

*Legality of the Search*

Jackson and Williams contend that the heroin was the product of an illegal search because Williams' arrest was a pretext for a warrantless search of the Granada Street residence in which he was arrested and because the scope of the search went beyond that properly incident to the arrest.

The Government had probable cause to believe that Williams was a party to a sale of heroin on March 9, 1967. He was not then arrested, but he was kept under surveillance by federal and state law enforcement officers to try to find out the source of the narcotics. On March 30, 1967, federal narcotics agent Watson obtained a warrant for Williams' arrest for the sale on March 9. Federal, state, and city officers met at the Federal Building in Phoenix, Arizona, about 8:00 p. m. on March 30 for the purpose of planning the execution of the arrest warrant. There is a conflict in the evidence as to whether a search of the Granada Street residence was discussed at that meeting. Police Officer Gutierrez testified that the residence search was discussed and planned. Other law enforcement officers testified that there was no discussion about searching the Granada Street residence.

After the meeting, the officers circulated in various locations known to be

---

1. 21 U.S.C. § 174 provides in pertinent part:
"Whoever * * * conceals * * * any such narcotic drug after being inported ed or brought in, knowing the same to have been imported or brought into the United States contrary to law, * * * shall be imprisoned not less than five or more than twenty years * * *.

"Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of the narcotic drug, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains the possession to the satisfaction of the jury."

frequented by Williams. During the period from 5:50 p. m. to 11:40 p. m. defendant Williams was constantly on the move. It was not until he returned to the Granada residence shortly before midnight that the officers located him. Shortly after midnight eight officers entered the residence to arrest Williams. Williams was discovered in the living room. The search began almost immediately and lasted for about one hour and forty-five minutes. Federal agent Watson testified that they were looking for contraband, in particular, narcotics, and for Government money which had been used to purchase narcotics.

■ Defendant Williams contends that this evidence shows that "the arresting officers, knowing 'they did not have probable cause to obtain a search warrant [for the Granada residence], used the arrest as a vehicle to circumvent the requirements of obtaining a search warrant." The Government agrees that an arrest may not be used as a pretext to search for evidence without a search warrant where one would ordinarily be required under the Fourth Amendment.

■ Whether or not an arrest is a mere pretext to search is a question of the motivation or primary purpose of the arresting officer. Improper motivation has been found where the arrest is for a minor offense which serves as a mere "sham" or "front" for a search for evidence of another unrelated offense for which there is no probable cause to arrest or search. (*See* Amador-Gonzalez v. United States (5th Cir. 1968) 391 F. 2d 308; Taglavore v. United States (9th Cir. 1961) 291 F.2d 262.) It has also been found where the arresting officer deliberately delays making the arrest in order to allow the arrestee to enter the premises which the officer desires to search. (*Compare* McKnight v. United States (1950) 87 U.S.App.D.C. 151, 183 F.2d 977, *with* United States v. Weaver (4th Cir. 1967) 384 F.2d 879, cert. denied (1968) 390 U.S. 983, 88 S.Ct. 1106, 19 L.Ed.2d 1282.)

■ There is ample evidence to sustain the District Court's finding that the arrest was not a pretext for the search. The search for contraband was related to the nature and purpose of the arrest. The delay in obtaining the arrest warrant was justified by the quest for more evidence and by the investigation to ascertain the source of the narcotics. The officers proceeded with due diligence to execute the warrant after it was issued by serving Williams wherever he could be found. There is no evidence that the officers deliberately passed up an earlier opportunity to arrest Williams on the warrant. We cannot hold as a matter of law on this record that the primary purpose of executing the warrant upon Williams when he returned to the Granada residence was to search that house. (*Compare* United States v. Costello (2d Cir. 1967) 381 F.2d 698, with United States v. James (6th Cir. 1967) 378 F. 2d 88.)

■ Williams was arrested in the living room of the Granada residence. Following his arrest, the officers searched the whole house. The heroin was found in a container on a closet shelf in the northeast bedroom. Chimel v. California, *supra,* held that a search of the house in which a defendant is arrested is no longer within the bounds of a search incident to an arrest and that the constitutional perimeter of such a search is the person of the arrestee and the area "within his immediate control." (395 U.S. at 763, 89 S.Ct. at 2034.) The Williams search is illegal under the *Chimel* standard, and the heroin should have been excluded from the evidence if the *Chimel* rule applies retroactively to searches conducted before June 23, 1969.

The Supreme Court has expressly left open the question of *Chimel's* retroactivity. (Shipley v. California (1969) 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732; *see also* Von Cleef v. New Jersey (1969) 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728.) However, in Desist v. United States (1969) 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248, the Court reiterated the guidelines for determining

retroactivity of a new constitutional rule first stated in Linkletter v. Walker (1965) 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601:

"The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." (394 U.S. at 249, 89 S.Ct. at 1033.)

The Court in *Desist* said the foremost of the three criteria was the first. If the purpose is to deter misconduct of police officers in conducting a search, the new exclusionary rule will not be given retrospective effect because that purpose is not advanced by penalizing conduct that has already occurred. The exclusionary rule in such cases, the Court observed, was a procedural device to curb illegal police action and not a rule affecting the integrity of the process for finding the innocence or guilt of an accused.

We are unable to see any meaningful difference between the purpose or the effect of the exclusionary rule announced in Katz v. United States (1967) 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, affecting the admissibility of evidence obtained by electronic eavesdropping, and the exclusionary rule announced in *Chimel*, affecting the admissibility of evidence obtained by a search not reasonably incident to an arrest. We conclude, therefore, that the rule of retroactivity stated in *Desist* with respect to *Katz* applies in full measure to *Chimel*. Accordingly, we hold that the rule of *Chimel* applies only to those searches claimed incident to an arrest, conducted after June 23, 1969.[2]

■ The legality of the search incident to Williams' arrest is controlled by

the pre-*Chimel* standards stated in United States v. Rabinowitz (1950) 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, and Harris v. United States (1947) 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399: Was the search reasonable under the totality of the circumstances? We think it was. The arrest was for the sale of heroin, and the object of the search was the discovery of the contraband and of the Government money used to purchase heroin. As in *Harris*, the nature of the fruits of the crime makes it likely that "they would have been kept in some secluded spot." The search covered the house in which Williams was found and in which he gave every appearance of residing. The search was not of an area more extensive than that permitted in *Harris*.

### Sufficiency of the Evidence

The Government's case against both Jackson and Williams rested exclusively upon the presumption from proof of possession stated in section 174. It was therefore incumbent upon the Government to prove beyond a reasonable doubt that each defendant possessed the heroin.

■ The Government had to prove that each defendant was in constructive possession of the heroin, because neither defendant had actual possession of the narcotic. One has constructive possession of contraband if he knows of its presence and has power to exercise dominion and control over it. (Figueroa v. United States (9th Cir. 1965) 352 F.2d 587; Arellanes v. United States (9th Cir. 1962) 302 F.2d 603, cert. denied (1962) 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238; Hernandez v. United States (9th Cir. 1962) 300 F.2d 114.)

Here is the evidence bearing upon the possession issue: When the federal narcotics agents rapped on the door of the Granada residence shortly after midnight on March 31, 1967, Jackson answered

2. The same result has been reached by the Fifth Circuit in Lyon v. United States (1969) 416 F.2d 91, the Second Circuit in United States v. Bennett (1969) 409

F.2d 888, and by the California Supreme Court in People v. Edwards (1969) Cal., 80 Cal.Rptr. 633, 458 P.2d 713.

the door and admitted the officers. She was fully clothed. The agents walked into the living room and placed Williams under arrest. He was sitting on a sofa in the living room eating a meal from a tray and watching television. He was wearing underwear, a robe, and slippers. After his arrest, Williams went to the northeast bedroom and dressed himself in clothing he took from the closet and the dresser in that room. Both the closet and the dresser contained men's and women's apparel. The heroin was later discovered on the shelf of the closet from which Williams took some of his clothes.

Before the night of Williams' arrest, the Granada house had been placed under surveillance. Jackson had been seen either entering or leaving the house on four or five occasions. There was no evidence that the women's apparel in the northeast bedroom was hers. There was no evidence that she owned or rented the house, or that Williams did so. Jackson's relationship, if any, to Williams was not proved.

To sustain the jury's finding of Jackson's guilt, we would have to decide that from the facts that she was in the house after midnight, that she had been seen entering and leaving the house on several prior occasions, and that there was feminine apparel in the northeast bedroom, the jury could reasonably have concluded that she was living in the house and sharing Williams' bedroom, that she had at least joint power to control the closet and its contents, and that she knew the heroin was there. Further, we would have to be satisfied that the jury could have reached those conclusions free from any reasonable doubt, *i. e.*, that kind of doubt "that would make a person hesitate to act" in the more serious and important affairs of his own life. Holland v. United States (1954) 348 U. S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150.) The evidence against Jackson does not rise to that standard, and the case against her collapses.

The evidence of Williams' possession is very different from that of Jackson's.

Williams was obviously at home in the Granada residence. He used clothes from the closet in which the heroin was found. He could have reached for the heroin as easily as he reached for his coat. The only ingredient of constructive possession which had to be proved circumstantially was his knowledge of the presence of the heroin. The jury could properly conclude that it was more probable than not that he had the requisite knowledge. From the presence of feminine apparel in the same closet, an inference can be drawn that a woman had access to the closet. But that inference does not contradict the inference that Williams knew that the heroin was in his closet and we cannot say that the inference is so strong as to raise a reasonable doubt that Williams did not know the contraband was there.

The judgment against Jackson is reversed. The judgment against Williams is affirmed.