## WILLIAMS *v.* UNITED STATES

No. 81.   Argued October 21, 1970—Decided April 5, 1971*

---

*Together with No. 82, *Elkanich* v. *United States,* also on certiorari to the same court.

WHITE, J., announced the Court's judgment and delivered an opinion, in which BURGER, C. J., and STEWART and BLACKMUN, JJ., joined. STEWART, J., filed a separate statement, *post*, p. 660. BRENNAN, J., filed an opinion concurring in the result, *post*, p. 660. HARLAN, J., filed an opinion concurring in the judgment in No. 82 and dissenting in No. 81, *post*, p. 675. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 665. BLACK, J., filed a statement concurring in the result, *post*, p. 660. DOUGLAS, J., took no part in the consideration or decision of these cases.

*Henry J. Florence* argued the cause for petitioner in No. 81. With him on the brief was *Philip M. Haggerty*. *Charles A. Miller,* by appointment of the Court, 396 U. S. 1065, argued the cause and filed briefs for petitioner in No. 82.

*James van R. Springer* argued the cause for the United States in both cases. On the brief in No. 81 were *Solicitor General Griswold, Assistant Attorney General Wilson, Francis X. Beytagh, Jr., Richard B. Stone,* and *Beatrice Rosenberg.* On the brief in No. 82 were *Solicitor General Griswold, Assistant Attorney General Wilson, Mr. Beytagh,* and *Miss Rosenberg.*

MR. JUSTICE WHITE announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE BLACKMUN join.

The principal question in these cases is whether *Chimel* v. *California,* 395 U. S. 752 (1969), should be applied retroactively either to the direct review of petitioner Williams' conviction or in the collateral proceeding initiated by petitioner Elkanich.

I

In No. 81, federal agents on March 31, 1967, secured a warrant to arrest petitioner Williams on charges of selling narcotics in violation of 21 U. S. C. § 174. Williams was arrested at his home that night. A quantity of heroin was discovered and seized in the course of a search incident to the arrest. The trial court sustained the search and the heroin was introduced in evidence. Williams was convicted and sentenced to a 10-year prison term. The judgment of conviction was affirmed by the Court of Appeals for the Ninth Circuit. *Williams* v. *United States,* 418 F. 2d 159 (CA9 1969). That court held: (1) that our intervening decision in *Chimel* v. *California, supra,* was not retroactive and did not govern searches carried out prior to June 23, 1969, the date of that decision; and (2) that the search was valid under pre-*Chimel* law evidenced by *United States* v. *Rabinowitz,* 339 U. S. 56 (1950), and *Harris* v. *United States,* 331 U. S. 145 (1947). The Court of Appeals also

rejected a claim that the search was invalid because the arrest was a mere pretext for an unwarranted search. We granted certiorari. 397 U. S. 986 (1970).

In No. 82, petitioner Elkanich was convicted on three counts of selling narcotics in violation of 21 U. S. C. § 174. He was sentenced to three concurrent 10-year sentences. The evidence introduced included marked bills given by federal agents to an intermediary to use in purchasing narcotics. The bills were seized during a search of petitioner's apartment following his arrest there. The search was challenged at trial on the ground that the arrest was invalid. Both the arrest and the incident search were upheld at trial and on direct appeal, *Elkanich* v. *United States,* 327 F. 2d 417 (CA9 1964), as well as by the District Court and the Court of Appeals in subsequent proceedings brought by petitioner under 28 U. S. C. § 2255. We granted the petition for certiorari to consider the effect, if any, of our *Chimel* decision, which intervened when the appeal from denial of petitioner's § 2255 application was pending in the Court of Appeals. 396 U. S. 1057 (1970). We affirm the judgments in both cases.

## II

Aside from an insubstantial claim by Williams that his arrest was invalid,[1] neither petitioner in this Court suggests that his conviction was unconstitutionally ob-

---

[1] The Court of Appeals correctly rejected Williams' claim that his arrest was a pretext to make an otherwise invalid search. *Williams* v. *United States,* 418 F. 2d 159, 160–161 (CA9 1969). In his petition for certiorari, Williams also argued that there was insufficient proof of his knowledge of and control over the heroin found in the incidental search of his home, and thus that the Government had failed to prove constructive possession. This claim was neither briefed nor argued by the parties, and we decline to disturb the judgment of the Court of Appeals rejecting it. See 418 F. 2d, at 162–163.

tained; no evidence and no procedures were employed at or before trial that violated any then-governing constitutional norms. Concededly, the evidence seized incident to the arrest of both petitioners was both properly seized and admitted under the Fourth Amendment as construed and applied in *Harris* in 1947 and *Rabinowitz* in 1950. Both *Harris* and *Rabinowitz,* however, were disapproved by *Chimel.* That case considerably narrowed the permissible scope of searches incident to arrest, and petitioners argue that the searches carried out in these cases, if judged by *Chimel* standards, were unreasonable under the Fourth Amendment and the evidence seized inadmissible at trial.[2] However, we reaffirm our

---

[2] Petitioner Williams was arrested pursuant to a warrant in the living room of his residence shortly after midnight. Eight officers were involved, and the entire house was searched for a period of about one hour and 45 minutes. The heroin introduced at trial was found in a container on a closet shelf in one of the bedrooms. *Williams, supra,* n. 1, at 161. The Government does not argue that this search incident to arrest complies with *Chimel.*

Elkanich was arrested without a warrant in his apartment. He does not argue that the arresting agents did not have probable cause to arrest but asserts that the search violated the Fourth Amendment. Three agents came to petitioner's apartment, and, after the door was opened by his wife in response to a knock, entered and immediately arrested petitioner. After handcuffing Elkanich, the agent in charge called for assistance. Three more agents arrived within 15 minutes, and they searched the four-room apartment for over an hour. The supervising agent asked petitioner if he had any large sums of cash, guns, "or anything of that kind" in the apartment. Petitioner at first said no, but later indicated there was some money in a broom closet. The agent found $500 above the molding at the top of the closet, returned to the living room, and searched petitioner and his wife, finding $200 on each of them. Another agent then found a second roll of bills above the molding in the broom closet, this one totaling about $1,000. Two other items later introduced in evidence were seized from a closet in the living room. Of the total of nearly $2,000 seized, $1,550 consisted of marked bills used by an undercover agent to

recent decisions in like situations: *Chimel* is not retro-active and is not applicable to searches conducted prior to the decision in that case. *Desist* v. *United States,* 394 U. S. 244 (1969).

In *Linkletter* v. *Walker,* 381 U. S. 618 (1965), we declined to give complete retroactive effect to the exclusionary rule of *Mapp* v. *Ohio,* 367 U. S. 643 (1961). Relying on prior cases, we firmly rejected the idea that all new interpretations of the Constitution must be considered always to have been the law and that prior constructions to the contrary must always be ignored. Since that time, we have held to the course that there is no inflexible constitutional rule requiring in all circumstances either absolute retroactivity or complete prospectivity for decisions construing the broad language of the Bill of Rights.[3]   Nor have we accepted as a dividing line

purchase narcotics from one Rios, whom petitioner was alleged to be supplying.

The Government here argues that exigent circumstances justify the search without a warrant.  The argument is that the presence of petitioner's wife in the apartment left the agents only two choices: (1) to postpone searching until a warrant could be secured, a course which would entail either some sort of control over the wife's activity or a risk that evidence would disappear; or (2) to search the apartment immediately, as they did.

Because of our resolution of the retroactivity question, we find it unnecessary to pass on this contention.

[3] Many of the cases are discussed in the majority and dissenting opinions in *Desist* v. *United States,* 394 U. S. 244 (1969).  These cases, and the general question of prospective effect for judicial decisions, have generated a substantial amount of commentary. See generally Bender, The Retroactive Effect of an Overruling Constitutional Decision: *Mapp* v. *Ohio,* 110 U. Pa. L. Rev. 650 (1962); Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va. L. Rev. 201 (1965); Levy, Realist Jurisprudence and Prospective Overruling, 109 U. Pa. L. Rev. 1 (1960); Meador, Habeas Corpus and the "Retroactivity" Illusion, 50 Va. L. Rev. 1115 (1964); Mishkin, The Supreme Court 1964 Term—Foreword: The High Court, the Great Writ, and the Due Process of Time

the suggested distinction between cases on direct review and those arising on collateral attack.[4] Rather we have proceeded to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter, supra,* at 629.[5]

---

and Law, 79 Harv. L. Rev. 56 (1965); Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N. Y. Ŭ. L. Rev. 631 (1967); Schwartz, Retroactivity, Reliability, and Due Process: A Reply to Professor Mishkin, 33 U. Chi. L. Rev. 719 (1966); Spruill, The Effect of an Overruling Decision, 18 N. C. L. Rev. 199 (1940); Note, Retroactivity of Criminal Procedure Decisions, 55 Iowa L. Rev. 1309 (1970); Comment, *Linkletter, Shott,* and the Retroactivity Problem in *Escobedo,* 64 Mich. L. Rev. 832 (1966); Comment, Prospective Overruling and Retroactive Application in the Federal Courts, 71 Yale L. J. 907 (1962). Cf. Kitch, The Supreme Court's Code of Criminal Procedure: 1968–1969 Edition, 1969 Sup. Ct. Rev. 155, 183–200.

[4] See *post,* p. 675 (HARLAN, J., concurring in judgments and dissenting). Compare Mishkin, The Supreme Court 1964 Term—Foreword: The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56 (1965), with Schwartz, Retroactivity, Reliability, and Due Process: A Reply to Professor Mishkin, 33 U. Chi. L. Rev. 719 (1966).

In rejecting the distinction between cases pending on direct review and those on collateral attack, the Court in *Johnson* v. *New Jersey,* 384 U. S. 719, 732 (1966), stated:

"Our holdings in *Linkletter* and *Tehan* were necessarily limited to convictions which had become final by the time *Mapp* and *Griffin* were rendered. Decisions prior to *Linkletter* and *Tehan* had already established without discussion that *Mapp* and *Griffin* applied to cases still on direct appeal at the time they were announced."

[5] In our more recent opinions dealing with the retroactive sweep of our decisions in the field of criminal procedure, the approach mandated by *Linkletter* has come to be summarized in terms of a threefold analysis directed at discovering:

"(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards,

Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect.[6] Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances.

It is quite different where the purpose of the new constitutional standard proscribing the use of certain evidence or a particular mode of trial is not to minimize or avoid arbitrary or unreliable results but to serve other ends. In these situations the new doctrine raises no question about the guilt of defendants convicted in prior trials. *Mapp* v. *Ohio* cast no doubt on the relevance or probity of illegally seized evidence but excluded it from criminal trials to deter official invasions of individual privacy protected by the Fourth Amendment. *Katz* v. *United States,* 389 U. S. 347 (1967), overruled *Olmstead* v. *United States,* 277 U. S. 438 (1928), and *Gold-*

and (c) the effect on the administration of justice of a retroactive application of the new standards."

*Stovall* v. *Denno,* 388 U. S. 293, 297 (1967); see also *Desist* v. *United States,* 394 U. S. 244, 249 (1969).

[6] See, *e. g., Arsenault* v. *Massachusetts,* 393 U. S. 5 (1968) (giving retroactive effect to the right to counsel provided in *White* v. *Maryland,* 373 U. S. 59 (1963)); *McConnell* v. *Rhay,* 393 U. S. 2 (1968) (giving retroactive effect to the right to counsel provided in *Mempa* v. *Rhay,* 389 U. S. 128 (1967)); *Berger* v. *California,* 393 U. S. 314 (1969) (giving retroactive effect to *Barber* v. *Page,* 390 U. S. 719 (1968)); *Roberts* v. *Russell,* 392 U. S. 293 (1968) (giving retroactive effect to *Bruton* v. *United States,* 391 U. S. 123 (1968)); *Jackson* v. *Denno,* 378 U. S. 368 (1964); *Gideon* v. *Wainwright,* 372 U. S. 335 (1963); *Douglas* v. *California,* 372 U. S. 353 (1963); *Griffin* v. *Illinois,* 351 U. S. 12 (1956).

*man* v. *United States,* 316 U. S. 129 (1942), and gave expanded Fourth Amendment protection against non-consensual eavesdropping. It followed that evidence obtained by nontrespassory electronic surveillance of a public telephone booth became subject to the exclusionary rule, which had been fashioned by the Court to exact compliance with the Amendment rather than to protect defendants from conviction on untrustworthy evidence. Thus the Court, when it came to consider the retroactivity of *Mapp* and *Katz,* was dealing with cases quite different from those situations where emerging constitutional doctrine casts such doubt upon the soundness of some aspect of prior trials that State and Federal Governments were disentitled from further pursuing the goals of their criminal law against defendants convicted in such prior trials.

The petitioners in both *Linkletter* and *Desist* were convicted in proceedings that conformed to all then-applicable constitutional norms. In both cases the government involved had a concededly guilty defendant in custody and substantial unsatisfied interests in achieving with respect to such defendant whatever deterrent and rehabilitative goals underlay its criminal justice system. Each defendant, Linkletter by the habeas corpus route, and Desist on direct appeal, claimed the benefit of a later decided case and demanded a new trial. But ordering new trials would have involved not only expense and effort but the inevitable risk of unavailable witnesses and faulty memories; the authorities might not have had the evidence they once had and might have been foreclosed from obtaining other evidence they might have secured had they known the evidence they were using was constitutionally suspect. Moreover, it was not essential to the deterrent purpose of the exclusionary rule that *Mapp* and *Katz* be given retroactive effect; indeed that purpose would have been only mar-

ginally furthered by extending relief to Linkletter, Desist, and all others in comparable situations. In these circumstances, we found no constitutional warrant for setting aside either conviction.[7]

---

[7] The Fourth Amendment cases do not stand alone. We have reached similar results in holding nonretroactive new interpretations of the Fifth Amendment's privilege against compelled self-incrimination, although some ramifications of the privilege have more connection with trustworthy results than does the exclusionary rule designed to enforce the Fourth Amendment. See *Tehan* v. *Shott,* 382 U. S. 406, 414–415, n. 12 (1966); *Johnson* v. *New Jersey,* 384 U. S. 719, 730 (1966); *Desist* v. *United States,* 394 U. S., at 249–250, n. 14; cf. *Mackey* v. *United States, post,* at 674–675. So, too, the right to jury trial secured by the Sixth Amendment "generally tends to prevent arbitrariness and repression," *DeStefano* v. *Woods,* 392 U. S. 631, 633 (1968), and the holdings in *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v. *California,* 388 U. S. 263 (1967), carry implications for the reliability of identification testimony. But both *Duncan* v. *Louisiana,* 391 U. S. 145 (1968), obligating the States to recognize the right to jury trial by virtue of the Fourteenth and Sixth Amendments, and *Wade* and *Gilbert* were applied only prospectively in view of the countervailing considerations that retroactivity would entail. *DeStefano* v. *Woods, supra; Stovall* v. *Denno,* 388 U. S. 293 (1967).

In both *Johnson* and *Stovall,* we frankly acknowledged that "[t]he extent to which a condemned practice infects the integrity of the truth-determining process at trial is a 'question of probabilities.'" 388 U. S., at 298. Where we have been unable to conclude that the use of such a "condemned practice" in past criminal trials presents substantial likelihood that the results of a number of those trials were factually incorrect, we have not accorded retroactive effect to the decision condemning that practice. See *e. g., DeStefano,* 392 U. S., at 633–634 (quoting *Duncan*): "'We would not assert, however, that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.'"

Our Brother HARLAN criticizes these decisions, stating that he finds "inherently intractable the purported distinction between those new rules that are designed to improve the factfinding process and those designed principally to further other values." *Post,* at 695. Earlier, he suggests that "those new rules cognizable on habeas ought to be

## III

Considering that *Desist* represents the sound approach to retroactivity claims in Fourth Amendment cases, we are confident that we are not constitutionally bound to apply the standards of *Chimel* to the cases brought here by Elkanich and Williams. Both petitioners were duly convicted when judged by the then-existing law; the authorities violated neither petitioner's rights either before or at trial. No claim is made that the evidence against them was constitutionally insufficient to prove their guilt. And the *Chimel* rule will receive sufficient implementation by applying it to those cases involving the admissibility of evidence seized in searches occurring after *Chimel* was announced on June 23, 1969, and carried out by authorities who through mistake or ignorance have violated the precepts of that decision.

## IV

Both from the course of decision since *Linkletter* and from what has been said in this opinion, it should be clear that we find no constitutional difference between the applicability of *Chimel* to those prior convictions that are here on direct appeal and those involving collateral proceedings. Nor in constitutional terms is there any difference between state and federal prisoners insofar as retroactive application to their cases is concerned.

---

defined, not by the 'truth-determining' test, but by the *Palko* [v. *Connecticut*, 302 U. S. 319, 325 (1937)] test." *Post*, at 694. But operating within the confines of a rule that seeks to determine, *inter alia*, whether a newly proscribed practice has probably produced factually improper results in cases where it was employed is surely to proceed with more definite bearings than are provided by a "test" that seeks to define those procedures which are "implicit in the concept of ordered liberty." See n. 8, *infra*.

We accept MR. JUSTICE HARLAN's truism, stated in dissent, that our task is to adjudicate cases and the issues they present, including constitutional questions where necessary to dispose of the controversy. Hence, we must resolve the Fourth Amendment issues raised by Elkanich and Williams. But this leaves the question of how those issues should be resolved. Assuming that neither has a colorable claim under the pre-*Chimel* law but both would be entitled to relief if *Chimel* is the governing standard, which constitutional standard is to rule these cases? This is the unavoidable threshold issue—as MR. JUSTICE HARLAN describes it in discussing cases before us on collateral review, a "choice of law problem." *Post,* at 682.

The opinions filed in these cases offer various answers to the question. We would judge the claims in both *Williams* and *Elkanich* by the law prevailing when petitioners were searched. Surely this resolution is no more legislative, and no less judicial, than that of MR. JUSTICE HARLAN. He feels compelled to apply new overruling decisions to cases here on direct review but deems himself free, with some vague and inscrutable exceptions,[8] to refuse the benefits of new decisions to those defendants who collaterally attack their convictions. The latter judgment seems to rest chiefly on his own assessment of the public interest in achieving finality in criminal litigation. The former is not explained at all except by repeated assertions that cases here on direct review are different.[9] But we have no authority to upset

---

[8] Compare MR. JUSTICE HARLAN's treatment of petitioner Elkanich's case, *post,* at 699–700, with his resolution of *Mackey, post,* at 700–701. Cf. his discussion of *Gideon* and its application to cases on collateral review. *Post,* at 693–694.

[9] Let us assume that X and Y are accomplices in a murder and that they are tried separately in the state courts. For any one of several reasons, including reversal and retrial or consensual delay, X's case proceeds slowly through direct review while Y's conviction

criminal convictions at will. Does the Constitution compel us to apply *Chimel* retroactively and set aside Williams' conviction when he was convicted on sound evidence secured in conformity with the then-applicable constitutional law as announced by this Court? As we have said, we think not—no more so than it compels applying the teachings of *Chimel* in reviewing the denial of Elkanich's petition for collateral relief. Other than considering it inherent in the process of judicial review, MR. JUSTICE HARLAN does not directly address the question. Nor does he purport to explain how the purpose of the exclusionary rule fashioned by this Court as

---

is quickly affirmed. Assume further that after X's conviction is affirmed by the State's highest court, this Court holds that a practice employed in both the X and Y trials violates the Constitution. Both X and Y come before this Court at the same time seeking to have the new rule applied to their cases—X on direct review and Y by way of collateral attack. (Or, X and Y could be petitioners tried for wholly different offenses in different States or in different districts in the federal system. X, tried in a crowded jurisdiction and having appellate review in a busy judicial system, would be before this Court on direct review, while Y, whose case arose before less congested courts, would most likely be here on collateral attack.)

Under MR. JUSTICE HARLAN's approach, X automatically receives the benefit of the new rule—because we are a court of law somehow bound to decide all cases here on direct review in accordance with the law as it exists when the case arrives for consideration. Although we remain a court of law, Y may or may not receive the benefit of the new rule, the result depending on whether the new rule is designed to correct a practice that has come, over time, to shock our Brother's conscience. Under our approach today, the results as to X and Y would be consistent, as they should be.

As a perceptive jurist has remarked:

"[W]hen a court is itself changing the law by an overruling decision, its determination of prospectivity or retroactivity should not depend upon the stage in the judicial process that a particular case has reached when the change is made. Too many irrelevant considerations, including the common cold, bear upon the rate of progress of a case through the judicial system." Schaefer, *supra,* n. 3, at 645.

a Fourth Amendment mechanism will be at all furthered by mechanically affording Williams the benefit of *Chimel.*

We are also unmoved by the argument that since the petitioners in cases like *Mapp, Duncan* v. *Louisiana,* 391 U. S. 145 (1968), and *Katz* have been given relief, when it was only by chance that their cases first brought those issues here for decision, it is unfair to deny relief to others whose cases are as thoroughly deserving. It would follow from this argument that all previous convictions that would be vulnerable if they occurred today would be set aside. Surely this is the tail wagging the dog. The argument was fairly met and adequately disposed of in *Stovall* v. *Denno,* 388 U. S. 293, 301 (1967). We see no reason to repeat or reconsider what we said in that case.

It is urged that the prevailing approach to retroactivity involves confusing problems of identifying those "new" constitutional interpretations that so change the law that prospectivity is arguably the proper course. But we have no such problems in these cases since to reach the result it did the Court in *Chimel* found it necessary to disapprove *Harris* and *Rabinowitz* and under those cases the search in *Chimel* and the searches now before us would have been deemed reasonable for Fourth Amendment purposes. Moreover, the idea that circumstances may require prospectivity for judicial decisions construing the Constitution is an old one; it is not a new problem for the courts. It has not proved unmanageable and we doubt that courts and judges have suddenly lost the competence to deal with the problems that it may present.[10]

The judgments are

*Affirmed.*

---

[10] Nor is the problem "greatly ameliorated," *post,* at 695, by the approach suggested by MR. JUSTICE HARLAN. For whenever our Brother HARLAN considers a case on collateral review, he must of

While joining the plurality opinion, MR. JUSTICE STEWART would also affirm the judgment in No. 82, *Elkanich* v. *United States,* on the alternative ground that the issue presented is not one cognizable in a proceeding brought under 28 U. S. C. § 2255. See *Harris* v. *Nelson,* 394 U. S. 286, 307 (dissenting opinion); *Kaufman* v. *United States,* 394 U. S. 217, 242 (dissenting opinion); *Chambers* v. *Maroney,* 399 U. S. 42, 54 (concurring opinion).

MR. JUSTICE BLACK, while adhering to his opinion in *Linkletter* v. *Walker,* 381 U. S. 618, 640 (1965), concurs in the result on the ground that he believes that *Chimel* v. *California,* 395 U. S. 752 (1969), was wrongly decided.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of these cases.

[For opinion of MR. JUSTICE HARLAN, concurring in the judgment in No. 82 and dissenting in No. 81, see *post,* p. 675.]

MR. JUSTICE BRENNAN, concurring in the result.

*Chimel* v. *California,* 395 U. S. 752 (1969), applied principles established by a long line of cases [1] to determine the permissible scope of a warrantless search sought

---

necessity determine which of the prisoner's claims are grounded on "new" rules in deciding what "the law in effect [was] when a conviction became final," *post,* at 692.

[1] Our cases have settled the proposition that the Fourth Amendment requires agents of the Government to obtain prior judicial approval of all searches and seizures, see, *e. g., Davis* v. *Mississippi,* 394 U. S. 721, 728 (1969); *Katz* v. *United States,* 389 U. S. 347, 356–357 (1967); *James* v. *Louisiana,* 382 U. S. 36 (1965); *Preston* v. *United States,* 376 U. S. 364, 368 (1964); *McDonald* v. *United States,* 335 U. S. 451, 455–456 (1948); *Agnello* v. *United States,* 269 U. S. 20, 33 (1925), subject only to a few narrow and well-delineated exceptions grounded upon urgent necessity. *Terry* v. *Ohio,* 392 U. S. 1, 16–27 (1968); see *Katz* v. *United States, supra,*

to be justified as the necessary incident of a lawful arrest. But in applying these principles to the circumstances involved in *Chimel,* we were compelled to overrule *Harris* v. *United States,* 331 U. S. 145 (1947), and *United States* v. *Rabinowitz,* 339 U. S. 56 (1950). *Harris* and *Rabinowitz* were founded on "little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests." *Chimel, supra,* at 764–765; see *United States* v. *Rabinowitz, supra,* at 83 (Frankfurter, J., dissenting). By the time of *Chimel,* this view had long since been rejected; but until that day, *Harris* and *Rabinowitz* survived as direct authority for the proposition that a lawful arrest would somehow justify a warrantless search of the premises on which the arrest was made, beyond the immediate reach of the person arrested.[2]

Accordingly, we are presented in these cases with the question whether *Chimel* should be applied to require the exclusion at trial of evidence which is the fruit of a search, carried out before our decision in *Chimel,* and which would be lawful if measured by the standards of *Harris* and *Rabinowitz,* but unlawful under the rule of *Chimel.* The Court today holds that the fruits of searches made prior to our decision in *Chimel* may be used in criminal trials if the searches may be justified

---

at 357 n. 19 and cases cited; cf. *Chambers* v. *Maroney,* 399 U. S. 42 (1970). And, in all events, "[t]he scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry* v. *Ohio, supra,* at 19, quoting *Warden* v. *Hayden,* 387 U. S. 294, 310 (1967) (concurring opinion).

[2] Long before *Chimel,* of course, we had made clear that *Harris* and *Rabinowitz* were not themselves without limit. *James* v. *Louisiana,* 382 U. S. 36 (1965); *Kremen* v. *United States,* 353 U. S. 346 (1957); see *Von Cleef* v. *New Jersey,* 395 U. S. 814 (1969); *Stanley* v. *Georgia,* 394 U. S. 557, 569–572 (1969) (STEWART, J., concurring in result).

under the standards of *Harris* and *Rabinowitz* as those standards had previously been applied. See, *e. g., Von Cleef* v. *New Jersey,* 395 U. S. 814 (1969). I agree. In *Stovall* v. *Denno,* 388 U. S. 293, 297 (1967), we said that

> "[t]he criteria guiding resolution of [this] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

All three factors imply that the rule of *Chimel* should be applied only to searches carried out after *Chimel* was decided.

# I

Like the Fifth Amendment's protection against compulsory self-incrimination, the warrant requirement of the Fourth Amendment stakes out boundaries beyond which the government may not tread in forcing evidence or information from its citizens. When coercion, impermissible under the Fifth Amendment, has actually produced an involuntary statement, we have invariably held that the fruits of that unconstitutional coercion may not be used to prosecute the individual involved for crime. *E. g., Rochin* v. *California,* 342 U. S. 165, 173 (1952) (Frankfurter, J.); *Ashcraft* v. *Tennessee,* 322 U. S. 143 (1944); *Boyd* v. *United States,* 116 U. S. 616, 630–635, 638 (1886).[3] Exclusion of statements impermissibly coerced is not merely a device to deter government agents from improper conduct in the future. Exclusion of coerced testimony is part and parcel of the privilege

---

[3] Under what circumstances the Fifth Amendment requires that the individual concerned be granted immunity from prosecution for the matters revealed in his statements is a question not pertinent here. See *Piccirillo* v. *New York,* 400 U. S. 548, 561–573 (1971) (BRENNAN, J., dissenting).

against self-incrimination. Likewise, when a search impermissible under the Fourth Amendment results in the seizure of evidence, exclusion of the fruits of that unconstitutional invasion is required not merely in hope of deterring unconstitutional searches in the future, but in order to vindicate the right of privacy guaranteed by the Fourth Amendment. See *Boyd* v. *United States, supra; Weeks* v. *United States,* 232 U. S. 383, 390–394, 398 (1914); *Mapp* v. *Ohio,* 367 U. S. 643, 656, 660 (1961). Exclusion of evidence in order to vindicate the right of privacy, however, does not improve the reliability of the factfinding process at trial. See *Desist* v. *United States,* 394 U. S. 244, 249–250 (1969), and cases cited. Accordingly, this factor does not require that the standards of *Chimel* be retroactively applied. *Desist* v. *United States, supra; Stovall* v. *Denno,* 388 U. S., at 297–299.

## II

The factor of reliance by law-enforcement officials on *Harris* and *Rabinowitz* points in the same direction. As we recognized in *Chimel* itself, Fourth Amendment jurisprudence has often followed a tortuous path. 395 U. S., at 755–762. So long as *Harris* and *Rabinowitz* were not visibly overruled, we cannot be surprised that policemen and those who offer them guidance may not have scrutinized their doctrinal underpinnings for signs of erosion. And the extent of reliance, it appears, has been considerable. The Government represents, and petitioners do not seriously dispute, that a very substantial number of searches have been carried out in reliance upon these cases. In many of these, there is no reason to doubt that a warrant could and would have been obtained if the officials involved had been aware that a warrant would be required. This factor as well, therefore, implies that *Chimel* should have only prospective application.

## III

Finally, we must evaluate the probable impact of retroactive application on the administration of justice. Persons convicted through the use of evidence inadmissible under *Chimel* have been found to have engaged in conduct that the government involved may legitimately punish. *Chimel* casts no doubt upon the propriety of the government's interest in punishing those who have engaged in such conduct. Accordingly, it may fairly be assumed that retroactive application of its standards would result in a substantial number of retrials. Yet *Chimel* likewise casts no doubt upon the reliability of the initial determination of guilt at the previous trial. Moreover, the legitimate reliance of law-enforcement officials on *Harris* and *Rabinowitz,* as already noted, may well have led them to conduct a warrantless search merely because the warrant requirement, although easily satisfied, was understandably not understood. The consequence of this is that retroactive application of the standards applied in *Chimel* would impose a substantial burden upon the federal and state judicial systems, while serving neither to redress knowing violations of individual privacy nor to protect a class of persons the government has no legitimate interest in punishing.

## IV

This is not to say, however, that petitioners are to be denied relief because they are probably guilty. "[T]here is always in litigation a margin of error, representing error in factfinding." *Speiser* v. *Randall,* 357 U. S. 513, 525 (1958). The constitutional requirement that guilt in criminal cases be proved beyond a reasonable doubt serves to limit, but cannot eliminate, the number of criminal defendants found guilty who are in fact innocent. See *In re Winship,* 397 U. S. 358, 370–372 (1970) (con-

curring opinion). In the present cases, both petitioners asserted their innocence by pleading not guilty and going to trial; and petitioner in No. 81, whose case is here on direct review, raised in his petition for certiorari the question whether the evidence presented at trial was sufficient to support a finding of guilt. But this Court does not sit to review such questions. In denying retroactive application to the rule of *Chimel*, we neither do nor could determine that every person convicted by the use of evidence obtained contrary to that rule is in fact guilty of the crime of which he was convicted. The question we face is not the legitimacy or sincerity of petitioners' claims of innocence, or indeed whether any such claims are expressly made at all. It is, instead, whether *Chimel* v. *California* compels us to conclude that the invasion of petitioners' privacy, conducted in justifiable but mistaken reliance upon the continuing validity of *Harris* and *Rabinowitz*, requires the exclusion of the fruits of that invasion from the factfinding process at trial. I agree with the Court that it does not, and that the standards of *Chimel* should apply only to searches carried out after June 23, 1969.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

After studying afresh the pattern of the Court's retroactivity decisions since *Linkletter* v. *Walker*, 381 U. S. 618 (1965), I conclude that a decision of this Court construing the Constitution should be applied retroactively to all cases involving criminal convictions not yet final at the time our decision is rendered. Sound jurisprudential reasoning, so well articulated by MR. JUSTICE HARLAN in his separate opinion covering the present cases, *post*, p. 675, in my view requires that cases still on direct review should receive full benefit of our supervening constitutional decisions. I am persuaded that

willingness to tolerate the inevitable costs and anomalies of the Court's current approach to retroactivity is incompatible with the judicial duty of principled review of convictions not yet final.

I disagree somewhat with MR. JUSTICE HARLAN as to the proper approach to retroactivity for cases arising on habeas corpus or other modes of collateral attack. In such cases I believe it is best to employ the three-part analysis that the plurality undertakes today in deciding the retroactivity of the rule in *Chimel* v. *California,* 395 U. S. 752 (1969). This mode of analysis was foreshadowed in *Linkletter,* where the question was whether the rule of *Mapp* v. *Ohio,* 367 U. S. 643 (1961), should be applied on collateral review. The method commends itself, once the point of finality after direct review is passed, as a careful and appropriate way of adjudicating the "procedural" rights of litigants in view of the purposes of a new decisional rule and the concerns of effective law enforcement. In particular, if the purposes of a new rule implicate decisively the basic truth-determining function of the criminal trial, then I believe the rule should be given full retroactive application, for the required constitutional procedure itself would then stand as a concrete embodiment of "the concept of ordered liberty." *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937).

In light of the above, I concur in the Court's disposition of No. 82. That case is before us on collateral review. For cases in such a posture the mode of analysis used by the plurality is appropriate, and I agree that the *Chimel* rule should not be applied retroactively to such cases.

No. 81 is before us on direct review. Since there is a clear violation of *Chimel* on the facts, I would reverse the judgment below, for I believe that the same constitutional rule should be applied to adjudicate the rights of the petitioner in No. 81 as was applied in Chimel's case.