**UNITED STATES of America**

**v.**

**John Anthony MASIELLO et al.,**
**Defendants.**

**No. 69 Cr. 417.**

United States District Court,
S. D. New York.

June 22, 1971.

Whitney North Seymour, Jr., U. S. Atty. Southern District of New York, by Edward M. Shaw, Asst. U. S. Atty., for United States of America.

Abraham Brodsky, Irving Anolik, New York City, for defendants.

LASKER, District Judge.

On January 20, 1970, defendants John Anthony Masiello and John A. Masiello, Jr., were convicted, after a trial by jury, of various violations of Title 18, U.S.C. § 201(b) and conspiring to commit such violations.

On March 19, 1969, a search and seizure had occurred incident to the arrest of co-defendant Thomas McKeever. A pretrial motion to suppress the evidence seized was denied by Judge Palmieri without a hearing. Certain checks taken during that search were introduced into evidence against the Masiellos and over their objections.

Defendants appealed their convictions, and on November 10, 1970, the Court of Appeals remanded the case for a hearing on the reasonableness of the search of March 19, 1969. The Court of Appeals

found that there were "considerable discrepancies" between the affidavits of the government officers and that of an official of the corporation whose checks were seized as to what occurred during the search and seizure. The Court then observed:

"It has been claimed that extensive portions of the enormous amounts of material seized have no possible relevance to the case at hand. It was further alleged that the federal officers conducted 'a general rummage of the suite and a wholesale seizure of the files and records contained therein.' If these characterizations of the facts are accurate, the activities of the federal officers could hardly be considered consistent with the requirements of the fourth amendment. See Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969) (per curiam); Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957) (per curiam).

"We therefore conclude that a hearing should be held and findings be made below on the extent and reasonableness of the search and seizure, and remand to request that Judge Lasker conduct such a hearing and report. We meanwhile retain jurisdiction of the appeal."

United States v. Masiello et al., 434 F.2d 33 (1970).

The standards to be applied in determining the reasonableness of the search are those which existed prior to the ruling in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388, 1971).

## I.

The hearing on remand was held on February 19 and February 22, 1971. The witnesses for the government included Edward J. O'Neill, John J. McFadden, and Frank J. Nemic, all of whom were postal inspectors in New York City on the date of the search. Witnesses for the defendants were Thomas Martin, an employee of A.N.R. Leasing Corporation at the time of the search, and Daniel Dillon, past secretary and employee of A.N.R. Leasing Corporation. On the basis of the testimony and the exhibits placed in evidence, I find the following facts:

O'Neill was in charge of the investigation of alleged bribery of postal officials by the defendants. At 10:45 A.M. on March 19, 1969, the indictment against defendants was filed. Knowing, as O'Neill did, before the handing down of the indictment, that John Masiello, Sr. had been convicted of smuggling, John Masiello, Jr. was under indictment for assault, and Thomas McKeever had been convicted of extortion, O'Neill and the Assistant United States Attorney in charge of the case requested bench warrants for the arrest of the Masiellos and McKeever. The court issued the warrants.[1] At 12:30 Inspectors O'Neill, McFadden, Nemic and Myers arrived at the Masiello office, which was also the office of A.N.R. Leasing Corporation, controlled by the Masiellos, at 332 East 149th Street. They found McKeever on the premises and arrested him.

Prior to the time of the arrest, O'Neill had been informed by Andrew Daly, a postal employee, that A.N.R. Leasing and Coastwide Leasing had paid hotel bills for various postal employees and that the Masiellos had furnished him and another postal employee with free liquor and discount TV sets. In addition, one Bert Brodsky had informed O'Neill that John Masiello, Sr. had stated in his presence that Masiello or one of his companies had made payments on an automobile for Michael DeMasi, a postal employee, and that Masiello, Sr.

---

1. The arrest occurred after indictment and was lawful and with probable cause. Indeed, there seems to be no issue on this point. There is no indication that the question was raised by defendants before the Court of Appeals, nor was it included in the Court's mandate or in the defendants' briefs on remand.

had advised Masiello, Jr. to cancel further payments when DeMasi was no longer useful to A.N.R.

Accordingly, after the arrest of McKeever, O'Neill asked Thomas Martin, the A.N.R. bookkeeper, where the cancelled checks of A.N.R. and related companies were kept. In response Martin exhibited to O'Neill in room "C" 12 cartons of cancelled checks (each 5½" x 11" by 25") of A.N.R. and other Masiello companies, including Coastwide Leasing, Corporate Systems, Inc., and Set-Mar Holding Corporation, totaling approximately 20,000 checks. O'Neill looked through the checks to see if he could find those made to cover the hotel bills of postal employees or those for DeMasi's car or other payments to or for postal employees, but, as he observed, "I looked, but there were so many checks that I just gave up." (Tr., p. 58). The checks were seized.

McFadden asked Martin to show him where the check stub books were. Martin produced nine such books from a file cabinet in his room, five for A.N.R., two for Set-Mar, one for Coastwide, and one for Corporate Systems.

The arresting officers also seized an A.N.R. cash receipts and disbursements book for the period 1966–1967. They did not take the volume covering the current period.

Bearing in mind the allegation that the Masiellos had been paying for DeMasi's car and that Brodsky had told Inspector Nemic that he believed A.N.R. was receiving payment for more vehicles than it was furnishing to the government, Inspector McFadden asked Martin for vehicle payment records. Martin produced 154 truck and vehicle booklets which were seized.

The last item seized was a purchase order book of A.N.R. found on Martin's desk. According to McFadden, this item was taken because "[w]e had prior to going to ANR's office, had learned from an employee in the garage that a damage claim filed by ANR Corporation had been questioned as to its validity, and he

had gone to the invoice listed, new parts on the repair on ANR tractor. And the employee had gone to the company on which the invoice had been written and found that this coupon was among a number that had been missing from that office." (Tr., p. 100).

The inspectors had on hand in their cars unassembled cartons which were brought up to the office and assembled. The material seized was placed in the cartons and removed. A handwritten inventory of the material taken was prepared in duplicate by the inspectors, signed by McFadden, and initialed on each page by Martin.

Substantial amounts of material on the premises were neither searched nor seized. The material not seized included the contents of four 4-drawer file cabinets in Martin's room, eight 4-drawer file cabinets in Alcove "D" which Dillon told O'Neill contained "motor vehicle records, bills, [and] invoices" and boxes of papers contained in room "C". No search or seizure was made in the room of John Masiello, Sr.

There is no dispute that the items designated above as seized were in fact taken by the government. There was sharp dispute at the hearing as to whether the government had in fact seized further items. Both defense witnesses testified that the inspectors took more records than listed in the signed inventory (GX 3), while the government witnesses testified that the list was complete. Martin asserted that a variety of documents other than those listed had been taken and that the inventory itself was not four but five or six pages in length.

Dillon did not participate in preparing the inventory, but "think[s] there were six or seven pages," never examined the document, but saw it laid out disarranged on Martin's desk and "doubt[s]" that there were only three to four pages. Martin admitted that he had received a copy of the inventory and delivered it to the Masiellos, but on the government's request the defendants were unable to

produce their copy of the inventory or to explain its whereabouts or disappearance.

In the light of all the evidence of record, I find the testimony of the government witnesses as to the extent of the search credible and that of defense witnesses untrustworthy, or, at the least, inaccurate and undependable.

## II.

The issue to be determined is the reasonableness of the search and seizure as measured by the standards existing prior to Chimel v. California, supra. Those standards were spelled out in United States v. Harris, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

The government contends that the search, incidental to a lawful arrest under warrant, was reasonable in scope under pre-*Chimel* standards. The defendants describe the search as "a general rummage of the suite and a wholesale seizure of the files and records contained therein," which cannot be sustained even under the criteria applicable prior to *Chimel.*

On the facts found above, it is concluded that the search, although admittedly involving substantial documentary material and several rooms of the A.N. R. office, was reasonable when measured by the applicable standards.

Defendants rely on three key decisions of the Supreme Court: Kremen v. United States, 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876 (1957); Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969), and Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L. Ed.2d 409 (1970).

In *Kremen,* the arresting officers searched the cabin where petitioners were found and seized its entire contents, removing them about 200 miles for the purpose of examination. The Court, in a brief per curiam opinion, found the search unreasonable. The brevity of the opinion limits its usefulness as a guide, but Justice Harlan's concurring opinion in *Von Cleef* (395 U. S. at 817, 89 S.Ct. at 2053) casts light in the dark corners, stating:

> "*Kremen* simply prohibits the police from seizing the entire contents of a building indiscriminately, without considering whether the property they take is relevant to the crime under investigation; it does not bar the removal of all property that may reasonably be considered evidence of crime."

Here no such indiscriminateness occurred. The subject matter seized related to the charges in the indictment. All of the material taken was in a category relevant to the investigation. It is true that a substantially greater number of items—checks, for instance—that proved necessary to the trial were removed. However, these were seized because it was not practical for the inspectors, the defendants, or their agents, to ascertain within a reasonable time precisely which checks related to the offenses charged.

*Von Cleef* also involved a warrantless search incidental to an arrest. There the police searched the entire house and seized several thousand articles. The search was held unconstitutional under the pre-*Chimel, Rabinowitz* and *Harris* standards. But the indiscriminateness of the search in *Von Cleef* is illustrated by the opinion's description of it as "combing a three-story, 16-room house from top to bottom and carting away several thousand papers, publications and other items." In the instant case, the search did not involve a "combing" nor were the entire premises searched. While a good many items were removed, the categories of the material seized were discriminatingly determined and the search discriminatingly omitted various rooms, cabinets and desks. The inspectors searched only the rooms which the defendants or their agents specified to be those in which evidence relating to case was located, and only carefully selected material was removed.

In *Vale,* the defendant was arrested at the front steps of his house. Thereafter the arresting officers searched the house itself and seized incriminating material.

The search was held unreasonable. The case at hand is distinguished from *Vale* in several respects. In the first place, the *Vale* opinion held that the search was not incidental to an arrest because it did not occur on the premises searched. Here the arrest was made in the premises which were searched. Second, the *Vale* search was of a dwelling house. Here, as in *Rabinowitz*, where emphasis in *approving* the search was placed on the fact that the search was conducted in "a business room to which the public, including the officers, was invited," the search was of a business establishment. The significance of this point was confirmed by repetition in *Von Cleef*. Third, the *Vale* search was held not to be in the immediate vicinity of the arrest; but Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), approved a search involving four separate rooms—similar to the instant case—apparently thereby finding such search to be "within the immediate vicinity of the arrest."

In the instant search the inspectors surely had probable cause to believe that they would discover documentary evidence of the crimes for which defendants had been indicted. Certain categories and only certain categories of material were seized. Those categories related clearly to the offenses charged.

Faced with the practical exigencies required by the review, for example, of 20,000 checks in order to find those relating to the crimes in question, and the risk that the items sought could be destroyed if left behind, the seizure was reasonable judged by the applicable pre-*Chimel* standards.

Defendants also contend that the government must show not only that the search was reasonable, but that it was not feasible to obtain a search warrant under the circumstances existing at the time. However, the cases cited by defendants' counsel do not appear to support this proposition, and indeed the law, in the case of a search incident to a lawful arrest, is to the contrary. As the Court stated in Cooper v. California, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967) (quoting United States v. Rabinowitz, supra, 339 U.S. at 66, 70 S. Ct. 430, 94 L.Ed. 653):

"It is no answer to say that the police could have obtained a search warrant, for '[t]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable.'"

The Court of Appeals of this Circuit cited this passage as expressive of the law in United States ex rel. Mahoney v. LaVallee, 396 F.2d 887, 889 (1968), cert. den. 395 U.S. 985, 89 S.Ct. 2137, 23 L. Ed.2d 774 (1969), remarking that "* * we are reassured [by the Supreme Court's statement in Cooper v. California] that the Supreme Court still adheres to its pronouncement in *Rabinowitz*." This principle does not appear to have been altered by the *Chimel* decision (at least insofar as it applies to searches incident to arrest as there defined), but, in any event, clearly was the pre-*Chimel* standard as noted in the 1968 opinion in *Mahoney*, supra.

Upon the evidence of record I find that the search and seizure in the instant case were reasonable under applicable law.