180 Cal.App.4th 308 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
JASPER DWIGHT BRANNER, Defendant and Appellant.
No. C059288.
Court of Appeals of California, Third District.
December 17, 2009.
As modified January 11, 2010.
*311 Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes, Brian G. Smiley and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
SCOTLAND, P. J.
Almost a century ago, when it created the exclusionary rule to deter improper conduct by law enforcement officers, the United States Supreme Court held the guilty must go free when evidence essential for their convictions was obtained by an officer in violation of the right against unreasonable search and seizure enshrined in the Fourth Amendment to the United States Constitution. (Weeks v. United States (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341]; see also United States v. Leon (1984) 468 U.S. 897, 906 [82 L.Ed.2d 677, 687, 104 S.Ct. 3405]; Mapp v. Ohio (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684].)
A question posed in this case is whether the guilty must go free when (1) at the time such evidence was obtained by a law enforcement officer, a decision of the United States Supreme Court instructed the officer that the manner in which he searched for and seized the evidence was lawful, but (2) thereafter, the Supreme Court changed its mind. As we will explain, the answer is "No."
Although it may be that a "criminal is to go free because the constable has blundered" (People v. Defore (1926) 242 N.Y. 13, 21 [150 N.E. 585]), the guilty should not go free when the constable did precisely what the United *312 States Supreme Court told him he could do, but the court later decides it is the one that blundered. Evidence seized during a search that was lawful pursuant to Supreme Court precedent existing at the time, but later overruled by the court, should not be excluded for two reasons: (1) "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates" (United States v. Leon, supra, 468 U.S. at p. 916 [82 L.Ed.2d at p. 694]) and, therefore, if a search by an officer complies with a court ruling that allows the officer to so act, "[p]enalizing the officer for the [court's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations" (id. at pp. 918, 921 [82 L.Ed.2d at pp. 696, 697]); and (2) applying the exclusionary rule in such a circumstance would have "substantial social costs" due to the "objectionable collateral consequence of [the rule's] interference with the criminal justice system's truth-finding function [by allowing] some guilty defendants [to] go free or receive reduced sentences" (id. at p. 907 [82 L.Ed.2d at p. 688]).
This principle, known as the good faith exception to the exclusionary rule, applies to the search and seizure in this case.
Defendant Jasper Dwight Branner, who was required to register as a convicted drug offender (Health & Saf. Code, § 11590), was arrested when officers investigating Vehicle Code violations discovered that he had not complied with the drug offender registration requirements, a misdemeanor (Health & Saf. Code, § 11594). Incident to defendant's arrest, officers searched the passenger compartment of his vehicle while defendant was in the back of a patrol car. Cocaine base and a gun were found.
When conducted on December 17, 2004, the search and seizure were lawful. (New York v. Belton (1981) 453 U.S. 454, 460 [69 L.Ed.2d 768, 775, 101 S.Ct. 2860] (hereafter Belton) [to establish a "straightforward," "workable rule" that informs a person of "the scope of his constitutional protection" and lets a law enforcement officer "know the scope of his authority" under various factual situations, the Supreme Court held that, when an officer "has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and "any containers found" there, even if the person arrested is no longer in the car (id. at pp. 456, 459-460, 462-463 [69 L.Ed.2d at pp. 772, 774-775, 776], fn. omitted)]; U.S. v. Humphrey (10th Cir. 2000) 208 F.3d 1190, 1196, 1202 ["to provide specific and coherent guidance to officers in the field" who arrest the occupant of a vehicle, Belton "created a `bright line' rule" authorizing officers to search, incident to arrest, the passenger compartment of the vehicle "without regard to the nature of the offense for which he was arrested" and regardless of whether the person "had been restrained," e.g., Humphrey had been handcuffed and placed in a patrol car].)
*313 Today, the search and seizure are deemed unlawful, unless it was reasonable to believe the car contained evidence of the offense for which the defendant was arrested. (Arizona v. Gant (2009) 556 U.S. ___, ___ [173 L.Ed.2d 485, 501, 129 S.Ct. 1710] (hereafter Gant) [officers "may search incident to arrest only the space within an arrestee's `"immediate control,"' meaning `the area from within which he might gain possession of a weapon or destructible evidence . . .' [citation]"; hence, a warrantless "vehicle search incident to a recent occupant's arrest [may not be done] after the arrestee has been secured and cannot access the interior of the vehicle" (id. at p. ___ [173 L.Ed.2d at p. 491]), unless "it is reasonable to believe the vehicle contains evidence of the offense of arrest" (id. at p. ___ [173 L.Ed.2d at p. 501])].)
Because the officers relied in good faith on the teaching of Belton, the exclusionary rule does not apply even though the holding of Gant is retroactive to this case. (See United States v. Leon, supra, 468 U.S. at pp. 916, 918 [82 L.Ed.2d at pp. 694, 696].)
Nevertheless, defendant contends the officers' discovery that he had failed to comply with drug offender registration requirements was the product of an unlawfully prolonged detention (citing People v. McGaughran (1979) 25 Cal.3d 577 [159 Cal.Rptr. 191, 601 P.2d 207] (hereafter McGaughran)), thus invalidating the ensuing search incident to defendant's arrest for the registration violation. The contention fails because changes in search and seizure law subsequent to the California Supreme Court's ruling in McGaughran make McGaughran obsolete and inapplicable to this case. In 1982, three years after McGaughran, California's voters added a provision to our state Constitution that precludes suppression of relevant evidence in a criminal case unless compelled by federal law. (See People v. McKay (2002) 27 Cal.4th 601, 605 [117 Cal.Rptr.2d 236, 41 P.3d 59].) Under federal law, an officer may, without violating the Fourth Amendment, arrest a person who in the officer's presence commits "even a very minor criminal offense" (Atwater v. Lago Vista (2001) 532 U.S. 318, 354 [149 L.Ed.2d 549, 577, 121 S.Ct. 1536]), such as a Vehicle Code violation. Consequently, the McGaughran limit on the time an officer may detain a Vehicle Code violator is no longer the law in California for purposes of Fourth Amendment analysis. (People v. McKay, supra, at pp. 607-619.)
Accordingly, we shall affirm the judgment in this case.

FACTS AND PROCEDURAL BACKGROUND
While conducting surveillance of an apartment complex because of complaints of drug sales in its parking lot, officers saw defendant's Jeep Wagoneer travel from Howe Avenue into the complex. On a prior occasion, the *314 officers had seen defendant in the vehicle at the apartment complex and knew he "was an 11590 drug registrant." (See Health & Saf. Code, § 11590 [a person convicted of certain drug crimes must register as a drug offender].) The rear license plate light of defendant's vehicle was not working (Veh. Code, §§ 24252, subd. (a), 24601), and one of the headlights was misaligned so that it illuminated the ground four to five feet in front of the vehicle (Veh. Code, § 24409). When the vehicle stopped and one of its passengers got out and started urinating on the wall of an apartment building, the officers approached and detained defendant due to the Vehicle Code violations. Asked if he was on probation or parole, or had outstanding arrest warrants, defendant said no. In response to a request for identification, defendant presented his driver's license. A records check, which took "probably less than five minutes," revealed the last address on defendant's drug offender registration. When asked if he was still living there, defendant said no, that he had been living with his mother for the past eight to 12 months. Believing that defendant was in violation of the drug offender registration requirements, an officer arrested him and put him in the back of an unmarked patrol car. (Health & Saf. Code, § 11594 [requires reregistering within 10 days of changing residences; failure to do so is a misdemeanor].) Officers then searched the passenger compartment of defendant's vehicle and found a gun and cocaine base. The entire encounter, from urination to arrest, took approximately 15 minutes.
Defendant was charged with possessing cocaine base for sale (Health & Saf. Code, § 11351.5), transporting cocaine base (Health & Saf. Code, § 11352, subd. (a)) while armed with a firearm (Pen. Code, § 12022, subd. (c)), and being a convicted felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)). It was further alleged that defendant had a prior conviction for possessing cocaine base for sale. (Health & Saf. Code, § 11370.2, subd. (a).)
After his motion to suppress evidence of the gun and cocaine base was denied, defendant pled no contest to possessing cocaine base and admitted the prior conviction allegation. The other charges were dismissed, and he was sentenced to the low term of three years for the drug charge, plus a consecutive term of three years for the prior conviction enhancement. The court also imposed various fines and fees.
Defendant appealed and on April 20, 2009, we affirmed the judgment. We later granted defendant's petition for rehearing, vacated our opinion, and requested supplemental briefing on whether the United States Supreme Court's decision in Gant, supra, 556 U.S. ___ [173 L.Ed.2d 485], issued the day after we had affirmed the judgment, applies to the search in this case and, *315 if so, "must the evidence be suppressed, i.e., is the purpose of the exclusionary rule advanced by applying it to a search carried out in lawful compliance with United States Supreme Court precedent that existed when the search and seizure occurred?"
The parties have filed supplemental briefing, and we now issue our opinion on rehearing.

DISCUSSION

I
Defendant contends the evidence must be suppressed because he was unlawfully detained and, even if the initial detention was permissible, it "became unduly prolonged based on an investigation unrelated to [the] Vehicle Code violations."
(1) An officer may detain a person when "the circumstances known or apparent to the officer . . . include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place . . ., and (2) the person he intends to stop or detain is involved in that activity." (In re Tony C. (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) The officer's suspicion must be objectively reasonable. (People v. Perrusquia (2007) 150 Cal.App.4th 228, 233 [58 Cal.Rptr.3d 485].)
Here, specific and articulable facts existed for the officers to have an objectively reasonable suspicion that defendant was violating the Vehicle Code because the rear license plate on his Wagoneer was not illuminated (Veh. Code, §§ 24252, subd. (a), 24601) and one of the headlights was out of alignment (Veh. Code, § 24409).
Defendant argues, however, the officers could not reasonably suspect that he was violating the Vehicle Code because his car was in the parking lot of an apartment complex, not a public highway (Veh. Code, § 360), and the Vehicle Code provisions at issue "refer exclusively to the operation of vehicles upon the highways, unless a different place is specifically referred to" (Veh. Code, § 21001). This contention ignores that the officers observed defendant driving on Howe Avenue, a public highway within the meaning of the sections at issue, before he drove into the apartment complex parking lot. Having reason to believe that the lighting violations did not begin just when defendant was in the parking lot, the officers had reason to detain defendant for having so violated the Vehicle Code while driving on Howe Avenue.
Defendant relies on McGaughran, supra, 25 Cal.3d 577, in arguing that the detention became unconstitutional when, in the words of his counsel, it was *316 "unduly prolonged beyond the time necessary to deal with citation of traffic offenses." In McGaughran, a person was stopped for driving in the wrong direction on a one-way public street. Beyond the time needed to cite him, the driver was detained for 10 minutes during a radio check to determine whether he had any outstanding arrest warrants. He did and was arrested. A search of his car revealed a radio that had been stolen the same day from a car parked about a mile from the arrest. The defendant's fingerprints were found on the car door that was broken open so the radio could be taken. (Id. at pp. 581-582, 585-586.) Noting the traffic violation was one for which the driver could not be taken into custody (id. at p. 583), McGaughran held that the 10-minute "additional period of detention for the purpose of seeking out unrelated arrest warrants in the name of [the driver] or his passenger was not `reasonably necessary' to [deal with the traffic offense], and hence `exceeded constitutional limitations'" (id. at p. 587).
As we will explain, the McGaughran limit on the time an officer may detain a Vehicle Code violator is no longer the law in California for purposes of Fourth Amendment analysis.
(2) Three years after the McGaughran decision was issued, the voters of California approved Proposition 8, which added a provision to our state Constitution to preclude the suppression of relevant evidence in a criminal case, unless compelled by federal law. (Cal. Const., former art. I, § 28, subd. (d) [now art. I, § 28, subd. (f)(2)]; People v. McKay, supra, 27 Cal.4th at p. 605 (hereafter McKay).)
(3) The effect of Proposition 8 on a case like the one now before us was explained in detail in McKay, where a bicyclist was stopped for riding in the wrong direction on a residential street, an infraction. When the bicyclist stated his name and date of birth but could not produce any identification, he was taken into custody and searched incident to arrest. Methamphetamine was found. (McKay, supra, 27 Cal.4th at p. 606.) He moved to suppress the evidence on the ground that the officer lacked the statutory authority to effect a custodial arrest. (Id. at pp. 606-607.) The California Supreme Court held the contention was "foreclosed by" Atwater v. Lago Vista, supra, 532 U.S. at page 354 [149 L.Ed.2d at p. 577], which ruled that, under federal law, an officer may, without violating the Fourth Amendment, arrest a person who in the officer's presence commits "even a very minor criminal offense." As McKay explained, it was immaterial whether the bicyclist's arrest violated California statutes; "[w]ith the passage of Proposition 8, we are not free to exclude evidence merely because it was obtained in violation of some state statute or state constitutional provision." (McKay, at pp. 607-608.) This is so because the United States Supreme Court "has repeatedly emphasized that the Fourth Amendment inquiry does not depend on whether the challenged police *317 conduct was authorized by state law." (Id. at p. 610.) Because the bicyclist's custodial arrest for the minor traffic violation did not violate the federal Constitution, the ensuing search incident to the arrest did not violate the Fourth Amendment. (Id. at pp. 605, 618.)
The same result must occur in this case. The prolonged detention of defendant for a "records check" while defendant was detained for Vehicle Code violations did not violate the United States Constitution, which would have permitted the officers to immediately place defendant in custody. (People v. Gomez (2004) 117 Cal.App.4th 531, 537-540 [12 Cal.Rptr.3d 398].) The fact such a prolonged detention was disapproved in McGaughran is immaterial for the reasons stated by the California Supreme Court in McKay, supra, 27 Cal.4th at pages 607-619. Absent a federal constitutional violation, the evidence seized as a result of the prolonged detention may not be suppressed. (People v. Gomez, supra, 117 Cal.App.4th at p. 539.)

II
We also reject defendant's contention that the United States Supreme Court's recent decision in Gant, supra, 556 U.S. ___ [173 L.Ed.2d 485] compels suppression of the gun and cocaine base seized in a search of defendant's vehicle incident to his arrest.
(4) In Gant, a motorist was arrested for driving with a suspended license. After he was handcuffed and locked in the backseat of a patrol car, officers searched the motorist's vehicle and found cocaine in the pocket of a jacket on the backseat. (Gant, supra, 556 U.S. at p. ___ [173 L.Ed.2d at p. 491].) Responding to the "chorus that has called for [the Supreme Court] to revisit [its previous ruling in] Belton[, supra, 453 U.S. 454 [69 L.Ed.2d 768]]," the court refused to follow Belton which, the court acknowledged, "has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search." (Gant, supra, at pp.___, ___ [173 L.Ed.2d at pp. 493, 495].) Gant concluded this broad reading of Belton is incompatible with the rationale upon which Belton relied (Gant, supra, at p. ___ [173 L.Ed.2d at p. 496]), i.e., an officer has "`ample justification' for a search of `the area from within which [an arrestee] might gain possession of a weapon or destructible evidence'" (Belton, supra, at pp. 457-458 [69 L.Ed.2d at p. 773]). Therefore, Gant held that, under the Fourth Amendment, "[p]olice may search a vehicle incident to a recent occupant's arrest only if [either of two justifications are present: (1)] the arrestee is within reaching distance of the passenger compartment at the time of the search or [(2)] it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable *318 unless police obtain a warrant or show that another exception to the warrant requirement applies." (Gant, supra, at p. ___ [173 L.Ed.2d at p. 501].)
(5) We agree with defendant, and the People concede, that Gant applies retroactively to this case. (Griffith v. Kentucky (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 661, 107 S.Ct. 708] ["a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a `clear break' with the past"]; People v. Reyes (1998) 19 Cal.4th 743, 755 [80 Cal.Rptr.2d 734, 968 P.2d 445] ["all new constitutional rules of criminal procedure are fully retroactive to cases not yet final, even when they represent a `clear break' with the past"]; People v. Davis (1997) 57 Cal.App.4th 1404, 1408, fn. 6 [67 Cal.Rptr.2d 748].)
Thus, the search of defendant's vehicle incident to his arrest while he was secured in the backseat of a patrol car violated the Fourth Amendment, unless it was "reasonable [for the officers] to believe the vehicle contain[ed] evidence of the offense of arrest." (Gant, supra, 556 U.S. at p. ___ [173 L.Ed.2d at p. 501].)
We need not decide whether it would have been reasonable for officers to believe that "evidence of the offense of arrest," such as evidence of defendant's current residence address (which could show that he violated his drug offender registration requirements by failing to register his current address), would be found in the passenger compartment of his vehicle, thus permitting the search of his vehicle under the second prong of the Gant test.
Instead, we must uphold the search and seizure by applying the good faith exception to the exclusionary rule.
As we have noted, Gant recognized that Belton had been "widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search." (Gant, supra, 556 U.S. at p. ___ [173 L.Ed.2d at p. 495].)
This prevailing view that Belton was a broad ruling is easily understood by reading the decision. After citing its precedent that a law enforcement officer has "`ample justification' for a search of `the area from within which [an arrestee] might gain possession of a weapon or destructible evidence'" (Belton, supra, 453 U.S. at pp. 457-458 [69 L.Ed.2d at p. 773]), the Supreme Court recognized the following reality: "`A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions . . . may be "literally impossible of *319 application by the officer[s] in the field . . ."' [citation]" who daily face a variety of factual situations and have "`only limited time and expertise to reflect on . . . the specific circumstances they confront.' [Citation.]" (Id. at p. 458 [69 L.Ed.2d at pp. 773-774].) Thus, Belton went on to articulate what is known as a bright-line rule, a "straightforward," "workable rule" that informs a person of "the scope of his constitutional protection" and lets an officer "know the scope of his authority" under various factual situations. (Id. at pp. 459-460 [69 L.Ed.2d at pp. 774-775].) "[W]hen [an officer] has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile" and "any containers found" there, even if the person arrested is no longer in the car and regardless of whether such a container "is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." (Id. at pp. 456, 460-461 [69 L.Ed.2d at pp. 772, 774-775], fns. omitted.)
Indeed, this broad understanding of Belton was commonly accepted by federal and state appellate courts. (See, e.g., U.S. v. Humphrey, supra, 208 F.3d at pp. 1196, 1202 ["to provide specific and coherent guidance to officers in the field" who arrest occupants of vehicles, Belton "created a `bright line' rule" authorizing officers to search, incident to arrest, the passenger compartment of the vehicle "without regard to the nature of the offense for which he was arrested" and regardless of whether the person "had been restrained"]; U.S. v. McLaughlin (9th Cir. 1999) 170 F.3d 889, 891-892; U.S. v. Snook (8th Cir. 1996) 88 F.3d 605, 607-608; U.S. v. Mitchell (7th Cir. 1996) 82 F.3d 146, 152; U.S. v. Doward (1st Cir. 1994) 41 F.3d 789, 792-794; U.S. v. White (6th Cir. 1989) 871 F.2d 41, 43-44; U.S. v. Karlin (7th Cir. 1988) 852 F.2d 968, 970-972; U.S. v. McCrady (8th Cir. 1985) 774 F.2d 868, 870-872; U.S. v. Cotton (10th Cir. 1985) 751 F.2d 1146, 1148; People v. Mitchell (1995) 36 Cal.App.4th 672, 674 [42 Cal.Rptr.2d 537]; People v. Stoffle (1991) 1 Cal.App.4th 1671, 1680-1682 [3 Cal.Rptr.2d 257]; State v. Miskolczi (1983) 123 N.H. 626 [465 A.2d 919]; Traylor v. State (Del. 1983) 458 A.2d 1170; State v. Loftus (1983) 111 Ill.App.3d 978 [67 Ill.Dec. 598, 444 N.E.2d 834]; State v. Cooper (1982) 304 N.C. 701 [286 S.E.2d 102]; State v. Winston (1982) 170 W.Va. 555 [295 S.E.2d 46]; State v. Valdes (Fla.Dist.Ct.App. 1982) 423 So.2d 944; State v. Hopkins (1982) 163 Ga.App. 141 [293 S.E.2d 529].)
Consequently, this "reading of Belton ha[d] been widely taught in police academies and . . . law enforcement officers ha[d] relied on the rule in conducting vehicle searches during the past 28 years" since Belton was decided. (Gant, supra, 556 U.S. at p. ___ [173 L.Ed.2d at p. 500].)
Given that, for so many years, law enforcement officers have reasonably relied on Belton as allowing them to search the passenger compartment of a *320 vehicle incident to the arrest of an occupant of the vehicle, even when the arrestee is not within reach of the passenger compartment, the exclusionary rule should not apply to a search and seizure that was conducted pursuant to Belton but is now unlawful pursuant to Gant. We explain why this is so.
(6) The exclusionary rule precludes a prosecutor in a criminal proceeding from using against a defendant any evidence obtained in violation of the defendant's Fourth Amendment rights. (Illinois v. Krull (1987) 480 U.S. 340, 347 [94 L.Ed.2d 364, 373, 107 S.Ct. 1160] (hereafter Krull).) The exclusionary rule "operates as `a judicially created remedy designed to safeguard Fourth Amendment rights generally through [the rule's] deterrent effect, rather than a personal constitutional right of the party aggrieved [by unlawful police conduct].' [Citation.]" (United States v. Leon, supra, 468 U.S. at p. 906 [82 L.Ed.2d at p. 687] (hereafter Leon).)
"As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced." (Krull, supra, 480 U.S. at p. 347 [94 L.Ed.2d at p. 373].) "Thus, in various circumstances, the Court has examined whether the rule's deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process. [Citations.]" (Ibid.) "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go freesomething that `offends basic concepts of the criminal justice system.' [Citation.]" (Herring v. United States (2009) 555 U.S. ___, ___ [172 L.Ed.2d 496, 505, 129 S.Ct. 695] (hereafter Herring).) And the "[i]ndiscriminate application of the exclusionary rule, therefore, may well `generat[e] disrespect for the law and administration of justice.' [Citation.]" (Leon, supra, 468 U.S. at p. 908 [82 L.Ed.2d at p. 687].)
Thus, the exclusionary "`rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application.' [Citations.]" (Herring, supra, 555 U.S. at p. ___ [172 L.Ed.2d at p. 505].)
In Leon, the Supreme Court held that, when an officer relies in good faith on a judicial decisiona warrant signed by a judgeto search for and seize evidence, the exclusionary rule does not apply if it is later shown the warrant was invalid. This is so because suppressing the evidence would not advance the purpose of the rule, which is to "deter police misconduct rather than to punish the errors of judges and magistrates." (Leon, supra, 468 U.S. at p. 916 [82 L.Ed.2d at 694].) "Penalizing the officer for the [court's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment *321 violations." (Id. at p. 921 [82 L.Ed.2d at p. 697]; see also Arizona v. Evans (1995) 514 U.S. 1, 15-16 [131 L.Ed.2d 34, 47, 115 S.Ct. 1185] (hereafter Evans).)
In Krull, the Supreme Court applied the reasoning of Leon and held that the exclusionary rule does not apply when an officer acted in objectively reasonable reliance on a statute which authorized an administrative search without a warrant, but the statute is later declared unconstitutional. (Krull, supra, 480 U.S. at pp. 343, 349-350 [94 L.Ed.2d at pp. 371, 375].) Suppression of the evidence "would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant." (Id. at p. 349 [94 L.Ed.2d at p. 375].) "Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." (Id. at pp. 349-350 [94 L.Ed.2d at p. 375].)
In Evans, the Supreme Court extended the reasoning of Leon and Krull to an officer's reasonable reliance on a court database that "indicat[ed] the existence of an outstanding arrest warranta record that [was] later determined to be erroneous." (Evans, supra, 514 U.S. at p. 3 [131 L.Ed.2d at p. 39].) Excluding evidence obtained by an arresting officer in a reasonable reliance on erroneous information entered in a police computer by a court employee "could not be expected to alter the behavior of the arresting officer," who, the trial court found, would have been "`derelict in his duty if he failed to arrest.'" (Id. at p. 15 [131 L.Ed.2d at p. 47].) And "there is no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on court employees responsible for informing the police that a warrant has been quashed. Because court clerks are not adjuncts to the law enforcement team ... [citation], they have no stake in the outcome of particular criminal prosecutions." (Ibid.)
In Herring, the Supreme Court extended the reasoning of Leon, Krull, and Evans to an officer's good faith reliance on an "isolated" "negligent bookkeeping error by another police employee," stating the existence of "an outstanding arrest warrant." (Herring, supra, 555 U.S. at p. ___ [172 L.Ed.2d at p. 502].) "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid [namely, that a guilty and possibly dangerous defendant may go free]. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly *322 negligent conduct, or in some circumstances recurring or systematic negligence. The error in this case does not rise to that level." (Id. at p. ___ [172 L.Ed.2d at p. 507].)
We conclude the reasoning of Leon, Krull, Evans, and Herring must be extended to the officers' search in this case. Just as the officers in Leon, Krull, and Evans could not be faulted for relying on judges' decisions or information provided by a court clerk, surely the officers here cannot be faulted for acting in conformity with the United States Supreme Court's decision in Belton which, for more than a quarter century, had uniformly been understood and applied by other courts to allow the officers to conduct the vehicle search incident to arrest even though defendant was in the back of a patrol car. As Gant noted, that reading of Belton had been widely taught in police academies and relied on by officers. Surely, the officers cannot have been expected to question the judgment of the Supreme Court (Krull, supra, 480 U.S. at p. 350 [94 L.Ed.2d at p. 375]), and suppressing evidence "would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant." (Id. at p. 349 [94 L.Ed.2d at p. 375].) And surely, the conduct in this case does not rise to the level of deliberate, reckless, or grossly negligent conduct required by Herring, supra, 555 U.S. at page ___ [172 L.Ed.2d at p. 507]. Thus, as was the circumstance in Leon, "Penalizing the officer for the [court's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (Leon, supra, 468 U.S. at p. 921 [82 L.Ed.2d at p. 697].)
For the reasons stated above, the good faith exception to the exclusionary rule applies and the evidence obtained by virtue of the search incident to arrest may not be suppressed despite the retroactive applicability of Gant to this case. As Mr. Bumble would say: "`If the law supposes [otherwise,] the law is a assa idiot.'" (Dickens, Oliver Twist (1838).)
Our dissenting colleague believes the law must be so foolish because the retroactivity decisions of the United States Supreme Court require the application of not only the new Fourth Amendment interpretation announced in Gant, but also the exclusionary remedy. Not so. Although our colleague accurately and in great detail recounts the Supreme Court's struggles, from Linkletter v. Walker (1965) 381 U.S. 618, 633, 636-640 [14 L.Ed.2d 601, 611-614, 85 S.Ct. 1731], to United States v. Johnson (1982) 457 U.S. 537, 549-550 [73 L.Ed.2d 202, 213-214, 102 S.Ct. 2579], to Griffith v. Kentucky, supra, 479 U.S. at page 328 [93 L.Ed.2d at p. 661], regarding whether a new rule of law must be applied retroactively, there is equally important precedent, from Leon, supra, 468 U.S. 897 [82 L.Ed.2d 677], to Krull, supra, 480 U.S. 340 [94 L.Ed.2d 364], to Evans, supra, 514 U.S. 1 [131 L.Ed.2d *323 34], to Herring, supra, 555 U.S. ___ [172 L.Ed.2d 496], regarding the appropriate remedy when an officer has violated the Fourth Amendment, i.e., the exclusionary rule should not be invoked when the officer acted in good faith reliance on a judicial decision or a statute authorizing the search and seizure, or on erroneous information that was not deliberate, reckless, or grossly negligent.
The dissent asserts that a distinction cannot be drawn between the rule and the remedy. However, this is precisely what the Supreme Court did in Leon, and then reaffirmed in Krull, Evans, and Herring. The exclusion of evidence obtained by a violation of the Fourth Amendment is not mandated by the Fourth Amendment; it is a court-created mechanism that may be used only when it is manifest that the purpose of the exclusionary rule requires its application despite its cost in withholding the truth, allowing the guilty to go free, and undermining public confidence in the legal system. If suppression of the truth by the exclusion of evidence is not mandated by the Fourth Amendment, and presentation of the truth by the introduction of evidence secured through violation of the Fourth Amendment works no new Fourth Amendment wrong (Leon, supra, 468 U.S. at p. 906 [82 L.Ed.2d at p. 687]), then retroactive application of the new constitutional rule announced in Gant does not require the suppression of evidence obtained in compliance with Belton prior to the decision in Gant. Simply stated, the question of whether evidence should be suppressed is a separate and distinct question from whether the Fourth Amendment was violated. This is no less true when a new rule of Fourth Amendment jurisprudence is applied retroactively.
(7) We conclude that, in light of established precedent for the good faith exception to the exclusionary rule (when the suppression of evidence would not advance the purpose of the exclusionary rule), the basic norms of constitutional adjudication do not require that defendant get the benefit of the exclusionary rule simply because Rodney Joseph Gant was the beneficiary of the Supreme Court's about-face in deciding that its holding in Belton was "faulty." (Gant, supra, 556 U.S. at p. ___ [173 L.Ed.2d at p. 501], disapproving Belton, supra, 453 U.S. 454 [69 L.Ed.2d 768].)[1] Indeed, to require suppression of evidence against defendant not because the constable blundered but because the constable did precisely what the Supreme Court told him he could dobut then changed its mind after the constable acted would be unjustified because it would not advance the purpose of the exclusionary rule, it would offend basic concepts of the criminal justice system by allowing a guilty and possible dangerous criminal to go free, and it would damage public confidence in the judicial system.
*324 We end by reflecting upon a prescient observation by beloved former Presiding Justice Robert K. Puglia, penned in 1979 before the United States Supreme Court's decision in Leon articulated the good faith exception to the exclusionary rule. "For many years, our system of criminal justice has been noted less for predictability than for instability. Judicial decisions often abruptly discard long-established procedures and replace them with new rules. Typically, these new rules are then applied to cases on appeal which were earlier tried in reliance upon the then existing but now discredited rule. In other words, the rules are changed to the benefit of the defendant and the detriment of the People after the game has been played. The inevitable consequence is the ex post facto creation of error where none otherwise would exist, and the unfortunate reversal of many convictions that would otherwise have been affirmed. These occurrences assuredly exact a considerable cost in loss of public confidence in the judicial system, not to mention the very tangible economic drain on public funds resulting from the retrial of these cases. And public confidence is even further eroded when intervening events render retrial impossible or futile. [¶] ... [¶] . . . Surely it must be possible to effect orderly change in judicial procedures without the attendant carnage that retroactivity has wreaked over the past two decades, a period in which the judicial landscape, resembling nothing so much as a giant junkyard, has been cluttered with the wreckage of convictions fairly won but sacrificed to the fetish of our highest courts for after-acquired wisdom. The tarnished image of the judiciary today is in significant part attributable to the social destabilizing effect of wholesale reversals of criminal convictions for failure to comply with rules that did not even exist at the time of trial. Certainly the maintenance of public acceptance of a system largely responsible for the protection of individual rights is no less important than the rights themselves." (People v. Remiro (1979) 89 Cal.App.3d 809, 821-822 [153 Cal.Rptr. 89].)
(8) Presiding Justice Puglia would be gratified to know that the good faith exception to the exclusionary rule exists to uphold both the search in this case and the conviction based upon evidence seized during that search.

DISPOSITION
The judgment is affirmed.
Nicholson, J. concurred.
ROBIE, J., Dissenting.
I respectfully dissent.
I agree with the majority's conclusion that Gant[1] must be given retroactive application and therefore applies to the search of defendant's vehicle. *325 However, I disagree with the majority holding that defendant must be denied the benefit of the exclusionary rule even if the search of his vehicle was, in fact, unconstitutional under Gant. Since the record below is insufficient to determine if the search of defendant's vehicle violated Gant, the matter should be remanded to the trial court to decide that issue and to determine whether the evidence should be suppressed.
In a recent post-Gant decision, the Ninth Circuit in U.S. v. Gonzalez (9th Cir. 2009) 578 F.3d 1130 explained that "[n]either the Supreme Court nor our court ... has applied the good faith exception to the scenario we face: a search conducted under a then-prevailing interpretation of a Supreme Court ruling, but rendered unconstitutional by a subsequent Supreme Court ruling announced while the defendant's conviction was on direct review." (Id. at p. 1132.) The circuit court determined that it could not "apply the good faith exception here without creating an untenable tension within existing Supreme Court law" because to refuse to give the defendant the benefit of the exclusionary rule "would conflict with the [Supreme] Court's retroactivity precedents." (Id. at pp. 1132-1133.)
Thus, the issue before us in this case is whether we must apply the Leon/Herring[2] good faith exception to the exclusionary rule here because to do otherwise would not advance the purpose of the ruledeterrence of police misconductor whether the Supreme Court's retroactivity precedents foreclose us from applying the good faith exception to this situation.
As the majority notes, the Supreme Court has dealt with and struggled with the retroactivity of its decisions involving the exclusionary rule on many occasions over the years. The majority acknowledges this body of law, but asserts that the Leon/Herring line of cases "is equally important." Indeed, the majority believes it must apply the Leon/Herring line of cases over the Supreme Court's retroactivity precedents, or else, in the words of Dickens, "`the law is a assa idiot.'" (Dickens, Oliver Twist (1838).)
I do not, as the majority suggests, believe the law is foolish. Yet at the same time, I do believe we must apply the exclusionary rule here if the search of defendant's vehicle was unconstitutional under Gant because that is the result compelled by the Supreme Court's retroactivity precedents, and nothing in the Leon/Herring line of cases compels, or justifies, a different result. I agree the cases from Leon through Herring stand for the proposition that the *326 exclusionary rule will not be applied when law enforcement has conducted a search in violation of the Fourth Amendment, but acted in good faith reliance on a warrant, or a statute, or information in a database, because applying the rule in such a circumstance will not advance the deterrent purpose of the rule. But as the Ninth Circuit suggested in Gonzalez, in none of those cases did the Supreme Court apply the good faith exception to "a search conducted under a then-prevailing interpretation of a Supreme Court ruling, but rendered unconstitutional by a subsequent Supreme Court ruling announced while the defendant's conviction was on direct review." (U.S. v. Gonzalez, supra, 578 F.3d at p. 1132.)
As I will explain, in its retroactivity precedents, the Supreme Court has decided already that advancing the deterrent purpose of the exclusionary rulewhich is the driving consideration behind the Leon/Herring good faith exception to the ruleis less important than honoring one of the basic norms of constitutional adjudication, which is treating similarly situated defendants the same. And to treat defendant in this case the same as the defendant in Gant, we must give him (as the Supreme Court gave Gant) the benefit of the exclusionary rule if the search of his vehicle violated the principles announced in Gant, even though the officers who conducted the search had no reason to anticipate the Gant decision. And we must do this even though it will not serve any deterrent purpose (just as giving Gant the benefit of the exclusionary rule served no deterrent purpose).
I do not agree with the majority's suggestion that choosing to treat Branner the same as Gant, even though it will not advance the deterrent purpose of the exclusionary rule, makes the law foolish. In any event, the choice between advancing the deterrent purpose of the exclusionary rule or treating Branner the same as Gant is not mine (or the majority's) to make. As I will explain, the Supreme Court has made this choice already in its retroactivity precedents, and we are bound, as a matter of federal constitutional law, by those precedents. (See Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 884 [281 Cal.Rptr. 34, 809 P.2d 809] (conc. opn. of Lucas, C. J.) ["On issues of federal constitutional law, this court is bound under the supremacy clause of the United States Constitution by applicable decisions of the United States Supreme Court."].)
With that preface, I turn to the Supreme Court's relevant retroactivity precedents.
After the Supreme Court first extended the exclusionary rule to cover evidence obtained by state officers used in state criminal prosecutions in Mapp v. Ohio (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684], the court applied the exclusionary rule to state court cases that were pending on direct *327 review when Mapp was decided without commenting on whether application of the rule in those cases would serve the deterrent purpose of the rule. (See, e.g., Fahy v. Connecticut (1963) 375 U.S. 85 [11 L.Ed.2d 171, 84 S.Ct. 229]; Stoner v. California (1964) 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889].) This retroactive application of Mapp was consistent with long-standing Supreme Court precedent. (See United States v. Schooner Peggy (1801) 5 U.S. (1 Cranch) 102, 110 [2 L.Ed. 49, 51]; Linkletter v. Walker (1965) 381 U.S. 618, 623, fn. 8 [14 L.Ed.2d 601, 604-605, fn. 8, 85 S.Ct. 1731] [noting that under Schooner Peggy, "a change in the law will be given effect while a case is on direct review ..."].)
In Linkletter, however, the court expressly considered whether Mapp's extension of the exclusionary rule to the states "operate[d] retrospectively upon cases finally decided in the period prior to Mapp." (Linkletter v. Walker, supra, 381 U.S. at pp. 619-620 [14 L.Ed.2d at p. 603]].) The court concluded the answer was "no." (Linkletter, at pp. 639-640 [14 L.Ed.2d at p. 614].) In reaching this conclusion, the court first observed "that the Constitution neither prohibits nor requires retrospective effect." (Id. at p. 629 [14 L.Ed.2d at p. 608].) Proceeding from that premise, the court determined it had to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." (Ibid.) The court then applied this approach to the exclusionary rule. The court noted that the reason for "requiring the exclusion of illegal evidence" is "the necessity for an effective deterrent to illegal police action," and the court could not "say that this purpose would be advanced by making the rule retrospective" because "[t]he misconduct of the police prior to Mapp has already occurred and will not be corrected by releasing the prisoners involved." (Id. at pp. 636-637 [14 L.Ed.2d at p. 613].) Accordingly, the court concluded "that though the error complained of might be fundamental it is not of the nature requiring us to overturn all final convictions based upon it." (Id. at pp. 639-640 [14 L.Ed.2d at p. 614].)
Two years later, in Stovall v. Denno (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], the Supreme Court explained that under Linkletter, "the retroactivity of other constitutional rules of criminal procedure" "implicate[s] (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." (Stovall, at pp. 296-297 [18 L.Ed.2d at p. 1203].) In Stovall, the court applied these criteria to determine the retroactivity of the rules announced in United States v. Wade (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926] and Gilbert v. California (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951] "requiring the exclusion of identification evidence which is tainted by exhibiting the accused to identifying witnesses before trial in the absence of his counsel." (Stovall, at p. 294 [18 L.Ed.2d at p. 1202].) The *328 court concluded "the Wade and Gilbert rules should not be made retroactive" and further concluded "that, for these purposes, no distinction is justified between convictions now final, as in the instant case, and convictions at various stages of trial and direct review" because "the factors of reliance and burden on the administration of justice [are] entitled to such overriding significance as to make that distinction unsupportable." (Id. at pp. 300-301 [18 L.Ed.2d at p. 1205].) The court explained that the defendants in Wade and Gilbert had to be given the benefit of the new rules as "an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum." (Stovall, at p. 301 [18 L.Ed.2d at p. 1206].) Recognizing that "[i]nequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue," the court nonetheless "regard[ed] the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making." (Ibid.)
Two years after Stovall, in Desist v. United States (1969) 394 U.S. 244 [22 L.Ed.2d 248, 89 S.Ct. 1030], the Supreme Court considered the retroactivity of its decision in Katz v. United States (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] that electronic eavesdropping "can comply with constitutional standards only when authorized by a neutral magistrate upon a showing of probable cause and under precise limitations and appropriate safeguards" (Desist, at p. 246 [22 L.Ed.2d at p. 253]). Noting that "[t]he eavesdropping in this case was not carried out pursuant to such a warrant ...," the plurality opinion authored by Justice Stewart[3] explained that "the convictions must ... be reversed if Katz is to be applied to electronic surveillance conducted before the date of that decision." (Ibid.) The plurality concluded, however, that Katz "should be given wholly prospective application." (Desist, at p. 246 [22 L.Ed.2d at p. 253].) Applying the three Linkletter criteria, the plurality noted that the first criterion"the purpose to be served by the new constitutional rule""strongly supports prospectivity for a decision amplifying the evidentiary exclusionary rule." (Desist, at p. 249 [22 L.Ed.2d at p. 255].) The plurality also found that the second and third criteria "militate in favor of applying Katz prospectively." (Desist, at p. 250 [22 L.Ed.2d at p. 256].) Finally, the plurality concluded that "[a]ll of the reasons for making Katz retroactive also undercut any distinction between final convictions and those still pending on review. Both the deterrent purpose of the exclusionary rule and the reliance of law enforcement officers focus upon the time of the search, not any subsequent point in the prosecution, as the relevant date. Exclusion of electronic eavesdropping evidence seized before Katz would *329 increase the burden on the administration of justice, would overturn convictions based on fair reliance on pre-Katz decisions, and would not serve to deter similar searches and seizures in the future." (Id. at p. 253 [22 L.Ed.2d at p. 257].)
In a dissenting opinion, the significance of which will become apparent, Justice Harlan expressed the view that "`[r]etroactivity' must be rethought." (Desist v. United States, supra, 394 U.S. at p. 258 [22 L.Ed.2d at p. 260] (dis. opn. of Harlan, J.).) He addressed both retroactivity on direct review and retroactivity on habeas corpus, but for present purposes only the former part of his opinion is material. There, Justice Harlan explained as follows:
"Upon reflection, I can no longer accept the rule first announced two years ago in Stovall v. Denno, supra, and reaffirmed today, which permits this Court to apply a `new' constitutional rule entirely prospectively, while making an exception only for the particular litigant whose case was chosen as the vehicle for establishing that rule. Indeed, I have concluded that Linkletter was right in insisting that all `new' rules of constitutional law must, at a minimum, be applied to all those cases which are still subject to direct review by this Court at the time the `new' decision is handed down.
"Matters of basic principle are at stake. In the classical view of constitutional adjudication, which I share, criminal defendants cannot come before this Court simply to request largesse. This Court is entitled to decide constitutional issues only when the facts of a particular case require their resolution for a just adjudication on the merits. [Citation.] We do not release a criminal from jail because we like to do so, or because we think it wise to do so, but only because the government has offended constitutional principle in the conduct of his case. And when another similarly situated defendant comes before us, we must grant the same relief or give a principled reason for acting differently. We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a `new' rule of constitutional law.
"The unsound character of the rule reaffirmed today is perhaps best exposed by considering the following hypothetical. Imagine that the Second Circuit in the present case had anticipated the line of reasoning this Court subsequently pursued in Katz .... Would we have reversed the case on the ground that the principles the Second Circuit had announcedthough identical with those in Katzshould not control because Katz is not retroactive? To the contrary, I venture to say that we would have taken satisfaction that the lower court had reached the same conclusion we subsequently did in Katz. If a `new' constitutional doctrine is truly right, we should not reverse lower courts which have accepted it; nor should we affirm those which have *330 rejected the very arguments we have embraced. Anything else would belie the truism that it is the task of this Court, like that of any other, to do justice to each litigant on the merits of his own case. It is only if our decisions can be justified in terms of this fundamental premise that they may properly be considered the legitimate products of a court of law, rather than the commands of a super-legislature." (Desist v. United States, supra, 394 U.S. at pp. 258-259 [22 L.Ed.2d at pp. 260-261] (dis. opn. of Harlan, J.).)
Two years after Desist, in Williams v. United States (1971) 401 U.S. 646 [28 L.Ed.2d 388, 91 S.Ct. 1148], a majority[4] of the court adhered to the plurality opinion in Desist and concluded the decision in Chimel v. California (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], which narrowed the scope of permissible searches incident to arrest (just like Gant narrowed the scope of permissible vehicle searches incident to arrest), was not to be retroactively applied to searches predating the decision. (Williams, at pp. 648-650 [28 L.Ed.2d at pp. 392-393].) Following his dissent in Desist, Justice Harlan dissented in Williams also. (See Mackey v. United States (1971) 401 U.S. 667, 675-702 [28 L.Ed.2d 404, 410-426, 91 S.Ct. 1160].) In responding to his dissent, Justice White and his companions explained that they were "unmoved by the argument that since the petitioners in cases like Mapp ... and Katz have been given relief, when it was only by chance that their cases first brought those issues here for decision, it is unfair to deny relief to others whose cases are as thoroughly deserving. It would follow from this argument that all previous convictions that would be vulnerable if they occurred today would be set aside. Surely this is the tail wagging the dog. The argument was fairly met and adequately disposed of in Stovall .... We see no reason to repeat or reconsider what we said in that case." (Williams, at p. 659 [28 L.Ed.2d at p. 398].)
Thus, in the wake of Williams, Supreme Court jurisprudence on the retroactivity of a Fourth Amendment decision involving the exclusionary rule stood like this: If a Supreme Court case expanded Fourth Amendment protections by limiting the type or scope of a permissible search, the defendant in that case was entitled to the benefit of the exclusionary rule under the newly announced legal standard, but all other defendants, including those whose cases were pending before the Supreme Court at the time the new standard was announced, were not entitled to the benefit of the exclusionary rule, primarily because granting them that benefit would not serve the deterrent purpose of the rule.
Eleven years after Williams, in United States v. Johnson (1982) 457 U.S. 537 [73 L.Ed.2d 202, 102 S.Ct. 2579], the Supreme Court faced the question *331 of whether Payton v. New York (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371]which "held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest""applie[d] to an arrest that took place before Payton was decided." (Johnson, at pp. 538-539 [73 L.Ed.2d at p. 206], fn. omitted.) In answering that question, the court surveyed its retroactivity decisions from Linkletter forward and finally agreed with Justice Harlan that "`"[r]etroactivity" must be rethought.'" (Johnson, at pp. 542-548 [73 L.Ed.2d at pp. 208-213].)
The court, however, did not entirely embrace Justice Harlan's approach to retroactivity, which would have required the court to apply any new Fourth Amendment rule to all cases on direct review, including giving the defendants in those cases the benefit of the exclusionary rule. Instead, the court in Johnson approached retroactivity by first concluding that "in three narrow categories of cases, the answer to the retroactivity question has been effectively determined, not by application of the Stovall factors, but rather, through application of a threshold test." (United States v. Johnson, supra, 457 U.S. at p. 548 [73 L.Ed.2d at p. 213], fn. omitted.) The first category of cases, in which retroactivity was automatic, was "when a decision of this Court merely has applied settled precedents to new and different factual situations." (Id. at p. 549 [73 L.Ed.2d at p. 213].) The second category, in which nonretroactivity was automatic, was "where the Court has expressly declared a rule of criminal procedure to be `a clear break with the past ....'"[5] (457 U.S. at p. 549 [73 L.Ed.2d at p. 213].) Finally, the third category, in which retroactivity was again automatic, was when the court ruled "that a trial court lacked authority to convict or punish a criminal defendant in the first place." (Id. at p. 550 [73 L.Ed.2d at p. 214].)
Noting that Johnson's case "neatly fits none of these three categories," the Supreme Court "next ... ask[ed] whether [the retroactivity] question would be fairly resolved by applying the rule in Payton to all cases still pending on direct appeal at the time when Payton was decided," i.e., by adopting the approach from Justice Harlan's dissent in Desist. (United States v. Johnson, supra, 457 U.S. at pp. 551, 554 [73 L.Ed.2d at pp. 214, 217].) The court answered that question in the affirmative. (Id. at pp. 554-563 [73 L.Ed.2d at *332 pp. 217-223].) In doing so, the court rejected two arguments by the government that are significant for present purposes.
First, the government argued "that new Fourth Amendment rules must be denied retroactive effect in all cases except those in which law enforcement officers failed to act in good-faith compliance with then-prevailing constitutional norms." (United States v. Johnson, supra, 457 U.S. at p. 559 [73 L.Ed.2d at p. 220].) The court rejected this argument because "[u]nder this view, the only Fourth Amendment rulings worthy of retroactive application are those in which the arresting officers violated pre-existing guidelines clearly established by prior cases. But as we have seen above, cases involving simple application of clear, pre-existing Fourth Amendment guidelines raise no real questions of retroactivity at all. Literally read, the Government's theory would automatically eliminate all Fourth Amendment rulings from consideration for retroactive application." (Id. at p. 560 [73 L.Ed.2d at p. 220].)
Second, the government argued that "retroactive application of Fourth Amendment decisions like Paytoneven to cases pending on direct review would not serve the policies underlying the exclusionary rule." (United States v. Johnson, supra, 457 U.S. at p. 560 [73 L.Ed.2d at p. 220].) The court agreed that "application of a Fourth Amendment ruling that worked a `sharp break' in the law ... would have little deterrent effect, because law enforcement officers would rarely be deterred from engaging in a practice they never expected to be invalidated." (Johnson, at p. 560 [73 L.Ed.2d at pp. 220-221].) The court further concluded, however, that "[t]his logic does not apply to a ruling like Payton, that resolved a previously unsettled point of Fourth Amendment law." (Johnson, at p. 560 [73 L.Ed.2d at p. 221].)
In summary, the Supreme Court held in Johnson that, except in those cases "clearly controlled by [its] existing retroactivity precedents," "a decision of this Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered." (United States v. Johnson, supra, 457 U.S. at p. 562 [73 L.Ed.2d at p. 222].) The court then proceeded to do just that. Because the Ninth Circuit had reversed Johnson's conviction on rehearing after Payton was decided (Johnson, at pp. 540-541 [73 L.Ed.2d at p. 207]), the Supreme Court affirmed the circuit court's decision, which "correctly held that the rule in Payton should apply to [Johnson's] case." (Johnson, at p. 563 [73 L.Ed.2d at p. 223].)
The effect of Johnson was to supplant the three-prong retroactivity test from Linkletter and replace it with the rule that a decision of the Supreme Court construing the Fourth Amendment was to be applied retroactively to all *333 convictions that were not yet final when the decision was rendered, except when the decision represented a "clear break" from previous decisions. The death knell for this "clear break" exception to the rule of retroactivity was sounded only five years later, however, in Griffith, which involved the retroactive application of Batson v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], a decision involving the handling of claims of racial discrimination in jury selection.
The specific question in Griffith was "whether the ruling in Batson applies retroactively to a federal conviction then pending on direct review." (Griffith v. Kentucky, supra, 479 U.S. at p. 320 [93 L.Ed.2d at p. 656].) In answering that question, the court again surveyed its retroactivity precedents from Linkletter forward, this time through Johnson. (Griffith, at pp. 320-322 [93 L.Ed.2d at pp. 656-658].) The court noted that in Johnson it had "shifted course" and "embraced to a significant extent the comprehensive analysis [of retroactivity] presented by Justice Harlan in" his dissent in Desist (as well as in his separate opinion in Mackey. (Griffith, at pp. 321-322 [93 L.Ed.2d at pp. 657-658].) What remained, however, was the "clear break" exception to the rule of retroactivity, which the court noted was "squarely before [them]" in Griffith. (Id. at p. 326 [93 L.Ed.2d at p. 660].)
Upon reexamining "the rationale for maintaining a `clear break' exception to the general proposition that new rules governing criminal procedure should be retroactive to cases pending on direct review," the court determined that "[f]or the same reasons that persuaded us in United States v. Johnson to adopt different conclusions as to convictions on direct review from those that already had become final, we conclude that an engrafted exception [to the rule of retroactivity] based solely upon the particular characteristics of the new rule adopted by the Court is inappropriate." (Griffith v. Kentucky, supra, 479 U.S. at p. 326 [93 L.Ed.2d at pp. 660-661].) First, the court explained that "the `clear break' exception, [which was] derived from the Stovall[/Linkletter] factors, reintroduces precisely the type of case-specific analysis that Justice Harlan rejected as inappropriate for cases pending on direct review." Second, the court explained that "the use of a `clear break' exception creates the ... problem of not treating similarly situated defendants the same." (Griffith, at p. 327 [93 L.Ed.2d at p. 661].) "The fact that the new rule may constitute a clear break with the past has no bearing on the `actual inequity that results' when only one of many similarly situated defendants receives the benefit of the new rule." (Id. at pp. 327-328 [93 L.Ed.2d at p. 661].) Accordingly, the court held "that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a `clear break' with the past." (Id. at p. 328 [93 L.Ed.2d at p. 661].)
*334 That the Griffith court intended by its decision to finally and fully adopt Justice Harlan's view on retroactivity, at least with regard to cases on direct review, appears from the foregoing passage from Griffith, explaining more fully the rationale behind a rule of complete retroactivity, without exceptions:
"In Justice Harlan's view, and now in ours, failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication. First, it is a settled principle that this Court adjudicates only `cases' and `controversies.' [Citation.] Unlike a legislature, we do not promulgate new rules of constitutional criminal procedure on a broad basis. Rather, the nature of judicial review requires that we adjudicate specific cases, and each case usually becomes the vehicle for announcement of a new rule. But after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review.... [¶] ... [¶]
"As a practical matter, of course, we cannot hear each case pending on direct review and apply the new rule. But we fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final. Thus, it is the nature of judicial review that precludes us from `[s]imply fishing one case from the stream of appellate review, using it as a vehicle for pronouncing new constitutional standards, and then permitting a stream of similar cases subsequently to flow by unaffected by that new rule.' [Citations.]
"Second, selective application of new rules violates the principle of treating similarly situated defendants the same." (Griffith v. Kentucky, supra, 479 U.S. at pp. 322-323 [93 L.Ed.2d at pp. 658-659]].)
Indeed, as recently as 2008, the Supreme Court expressly acknowledged that what it did in Griffith was adopt Justice Harlan's approach to retroactivity for cases pending on direct review. (Danforth v. Minnesota (2008) 552 U.S. 264, ___-___ [169 L.Ed.2d 859, 867-868, 128 S.Ct. 1029].)
The question then is whether, notwithstanding the foregoing retroactivity precedents, traced from Linkletter through Griffith, the good faith exception to the exclusionary rule can be applied to deny defendant the benefit of the suppression of evidence obtained in violation of Gant. I believe the answer to that question is "no."
In my opinion we cannot draw a distinction between the rule and the remedy with respect to the retroactivity of Gant, such that the rule regarding *335 the permissibility of a vehicle search incident to arrest is retroactive but the remedy for the violation of that rulesuppression of evidenceis not. To do so would resurrect the approach to the retroactivity of Fourth Amendment decisions formerly embraced by the Supreme Court in Desist, when the Supreme Court has long since repudiated that approach in Johnson and Griffith. The course of the Supreme Court's retroactivity jurisprudence shows that the court has fully embraced Justice Harlan's view on the retroactive application of new Fourth Amendment decisions, as explained in his dissent in Desist. Under that view, no multiprong test that takes into account the purpose of the exclusionary rule, nor any "clear break" exception to retroactivity that is based on considerations of whether law enforcement relied on the old standard and how the administration of justice will be affected, has any place in the retroactivity determination, nor can retroactivity be determined based on whether the police acted in good faith pursuant to then-extant Supreme Court case law. Instead, because the defendant in Gant was entitled to the suppression of the evidence found in a vehicle search that violated the principles set forth in that case,[6] so too is the defendant here entitled to suppression if the search of his vehicle violated the principles expressed in Gant. It does not matter that suppression of the evidence against defendant may not serve any deterrent purpose. The same is true of the suppression of the evidence against the defendant in Gant, and yet the evidence against him was suppressed. For purposes of applying Supreme Court decisions involving the exclusionary rule, the Supreme Court has decided that advancing the deterrent purpose of the rule is less important than honoring the paramount principle of treating similarly situated defendants the same. Nothing in Leon, Krull,[7]Evans,[8] or Herring suggests the court has changed its mind on this point. Certainly the court may change its mind once again, when (as is likely) this issue comes before it, but for purposes of this case we are bound by the law as it exists now. And under that law, if we deny defendant the benefit of the exclusionary rule, even if the search of his vehicle violated Gant, then Gant's case becomes the "`one case [fished] from the stream of appellate review'" to be used "`as a vehicle for pronouncing'" the new rule regarding the permissible scope of a vehicle search incident to arrest, while this case *336 would be among the "`stream of similar cases subsequently [permitted] to flow by unaffected by that new rule.'" (Griffith v. Kentucky, supra, 479 U.S. at p. 323 [93 L.Ed.2d at p. 658].) Applying the rule from Gant, but not the accompanying remedyexclusion of evidence obtained in violation of the rulewould violate the basic norms of constitutional adjudication underlying the Supreme Court's extant retroactivity precedents, which we are not at liberty to do. Accordingly, I would reverse the judgment and remand for a determination of whether defendant's motion to suppress should be granted under Gant.
NOTES
[1] Gant did not weigh in on this issue because the good faith exception to the exclusionary rule was not raised in that case.
[1] Arizona v. Gant (2009) 556 U.S. ___ [173 L.Ed.2d 485, 129 S.Ct. 1710].
[2] United States v. Leon (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]; Herring v. United States (2009) 555 U.S. ___ [172 L.Ed.2d 496, 129 S.Ct. 695].
[3] Justices Douglas, Harlan, and Fortas dissented in Desist; Justice Marshall did not participate; and Justice Black concurred in the result for the reasons stated in his dissenting opinion in Katz. Accordingly, Justice Stewart's opinion in Desist was a plurality.
[4] The lead opinion in Williams, authored by Justice White, was joined by Chief Justice Burger and Justices Stewart and Blackmun; Justice Brennan filed a concurring opinion.
[5] Significantly, although the court had previously stated that the retroactivity issue in the three categories of cases was not determined "by application of the Stovall[/Linkletter] factors," the court noted that the basis for rejecting retroactivity in the "clear break" category of cases was that "[o]nce the Court has found that the new rule was unanticipated, the second and third Stovall factorsreliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rulehave virtually compelled a finding of nonretroactivity." (United States v. Johnson, supra, 457 U.S. at pp. 548-550 [73 L.Ed.2d at pp. 213-214].) As will be seen, this point will be significant later in my discussion of Griffith v. Kentucky (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708].
[6] In Gant, the trial court denied the defendant's motion to suppress and he was subsequently convicted following a jury trial, but the Arizona Supreme Courtforeshadowing the United States Supreme Court's decision in Gant"concluded that the search of Gant's car was unreasonable within the meaning of the Fourth Amendment." (Arizona v. Gant, supra, 556 U.S. at p. ___ [173 L.Ed.2d at p. 492].) Agreeing "that this case involved an unreasonable search," the United States Supreme Court affirmed the judgment of the Arizona Supreme Court. (Id. at p. ___ [173 L.Ed.2d at p. 501].) Thus, Gant unquestionably received the benefit of the "new" Fourth Amendment rules the United States Supreme Court announced in his case.
[7] Illinois v. Krull (1987) 480 U.S. 340 [94 L.Ed.2d 364, 107 S.Ct. 1160].
[8] Arizona v. Evans (1995) 514 U.S. 1 [131 L.Ed.2d 34, 115 S.Ct. 1185].